# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 7, 2022

Lyle W. Cayce
Clerk

No. 18-11368

SHANNON DAVES; SHAKENA WALSTON; ERRIYAH BANKS; DESTINEE TOVAR; PATROBA MICHIEKA; JAMES THOMPSON, *On Behalf of Themselves and All Others Similarly Situated*; FAITH IN TEXAS; TEXAS ORGANIZING PROJECT EDUCATION FUND,

*Plaintiffs—Appellants Cross-Appellees*,

*versus*

DALLAS COUNTY, TEXAS; ERNEST WHITE, 194TH; HECTOR GARZA, 195TH; RAQUEL JONES, 203RD; TAMMY KEMP, 204TH; JENNIFER BENNETT, 265TH; AMBER GIVENS-DAVIS, 282ND; LELA MAYS, 283RD; STEPHANIE MITCHELL, 291ST; BRANDON BIRMINGHAM, 292ND; TRACY HOLMES, 363RD; TINA YOO CLINTON, NUMBER 1; NANCY KENNEDY, NUMBER 2; GRACIE LEWIS, NUMBER 3; DOMINIQUE COLLINS, NUMBER 4; CARTER THOMPSON, NUMBER 5; JEANINE HOWARD, NUMBER 6; CHIKA ANYIAM, NUMBER 7 JUDGES OF DALLAS COUNTY, CRIMINAL DISTRICT COURTS,

*Defendants—Appellees Cross-Appellants*,

MARIAN BROWN; TERRIE MCVEA; LISA BRONCHETTI; STEVEN AUTRY; ANTHONY RANDALL; JANET LUSK; HAL TURLEY, DALLAS COUNTY MAGISTRATES; DAN PATTERSON, NUMBER 1; JULIA HAYES, NUMBER 2; DOUG SKEMP, NUMBER 3; NANCY MULDER, NUMBER 4; LISA GREEN, NUMBER 5; ANGELA KING, NUMBER 6; ELIZABETH CROWDER, NUMBER 7; CARMEN WHITE, NUMBER 8; PEGGY HOFFMAN, NUMBER 9; ROBERTO CANAS, JR.,

No. 18-11368

Number 10; Shequitta Kelly, Number 11 Judges of Dallas County, Criminal Courts at Law,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-154

---

Before Owen, *Chief Judge*, and Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, and Wilson, *Circuit Judges*.[*]

Leslie H. Southwick, *Circuit Judge*, joined by Owen, *Chief Judge*,[†] and Jones, Smith, Elrod, Ho, Duncan, Engelhardt, and Wilson, *Circuit Judges*:

This opinion partially resolves an interlocutory appeal of a preliminary injunction. Not everything in this opinion is unfinished, though. Two rulings now are to VACATE the preliminary injunction and REMAND for limited purposes. Our final resolution of remaining issues will follow the remand.

The United States District Court, Northern District of Texas, certified this suit as a class action challenging the bail system in Dallas County, Texas. According to the Plaintiffs, indigent arrestees are subjected to an unconstitutional "system of wealth-based detention." The claimed constitutional violation is that secured money bail is imposed without procedural safeguards or substantive findings that less intrusive conditions of release are inadequate to meet the state's interests in pretrial detention.

---

[*] Judge Oldham was recused and did not participate.

[†] Chief Judge Owen joins all except Parts I.D. and II.C., which pretermit issues regarding the Sheriff.

Our decision today does not reach the merits. We are at an earlier and required stage in the analysis applicable to litigation in federal court. Are there appropriate parties in the case to allow the validity of bail practices in Dallas County to be determined? Does a legal doctrine apply that instructs federal courts not to intervene? Members of this court have different understandings on how to resolve these threshold issues, but the importance of the Plaintiffs' claims is not among the disputes. Separate opinions can at times seem to be talking past each other. All of us have sought to avoid that.

The district court issued a preliminary injunction that required "notice, an opportunity to be heard and submit evidence within 48 hours of arrest, and a reasoned decision by an impartial decision-maker." *Daves v. Dallas Cnty.*, 341 F. Supp. 3d 688, 697 (N.D. Tex. 2018) (quoting *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018)). Almost all parties exercised their right to bring interlocutory appeals or cross-appeals. *See* 28 U.S.C. § 1292(a)(1). A panel of this court affirmed most of the injunctive relief but disagreed with certain terms of the injunction and with holdings regarding which of the Defendants would be subject to the injunction. *Daves v. Dallas Cnty.*, 984 F.3d 381 (5th Cir. 2020). That opinion was withdrawn as a result of the court's voting to rehear the appeal *en banc. Daves v. Dallas Cnty.*, 988 F.3d 834 (5th Cir. 2021).

The district court issued the injunction without first ruling on several motions that presented significant threshold questions, including abstention, judicial and legislative immunity, and standing. Pretermitting rulings on the motions may have resulted from the district court's understanding that our *ODonnell* precedents had already rejected similar arguments.

Some of those preliminary questions need answers now. We have authority to address them even when jurisdiction for the appeal is derived

from a ruling on an injunction motion if the answers have significant bearing on that ruling:

> Appellate consideration of interlocutory injunction appeals under § 1292(a)(1) ordinarily focuses on the injunction decision itself, but the scope of appeal is not rigidly limited. Even with respect to preliminary injunction decisions, other matters may be inextricably bound up with the decision or may be considered in the wise administration of appellate resources.

16 Charles Alan Wright et al., Federal Practice and Procedure § 3921.1 (3d ed. Apr. 2021 update); *see Association of Co-op. Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1138 (5th Cir. 1982).

We agree with a sister circuit that, on the appeal from a preliminary injunction, issues relating to whether there is a proper suit at all can be decided, such as the existence of subject-matter and personal jurisdiction and questions regarding abstention. *Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24, 31 (1st Cir. 2010). One of our precedents explained that point but in more general terms: "Ordinarily the scope of appellate review under § 1292(a)(1) is confined to the issues necessary to determine the propriety of the interlocutory order itself." *Janvey v. Alguire*, 647 F.3d 585, 603–04 (5th Cir. 2011) (quoting 16 Charles Alan Wright et al., Federal Practice and Procedure § 3921.1 (2d ed. 2011)).

In summary, our appellate role is to review what the district court has done, but on certain potentially determinative issues, the district court has yet to rule. We conclude it is possible on this record and briefing to make limited holdings now about whether any defendant was acting on behalf of Dallas County and about standing. As to abstention, though, briefing exists but is cursory. We order a limited remand for the district court to conduct such proceedings as it finds appropriate and decide whether abstention is required. Once that decision is made, we will complete our review.

No. 18-11368

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2018, 6 indigent individuals arrested for misdemeanor or felony offenses in Dallas County filed a class action under 42 U.S.C. § 1983 against Dallas County; 17 Dallas County District Court and Criminal District Court Judges ("District Judges"), who handle felony cases; 11 Dallas County Criminal Court at Law Judges ("County Judges"), who handle misdemeanors; 6 of the Dallas County Magistrate Judges;[1] and the Sheriff of Dallas County.[2] The Plaintiffs allege that indigent arrestees in Dallas County are jailed without sufficient procedural safeguards and substantive findings that would justify detention. The claimed necessary findings are that less intrusive conditions of release are inadequate to meet the state's interests in pretrial detention. Based on those allegations, the Plaintiffs claim that the Defendants violate the Plaintiffs' Fourteenth Amendment rights to procedural due process, equal protection, and substantive due process.

Along with the complaint, the Plaintiffs filed a motion for class certification and one for a preliminary injunction. The requested preliminary

---

[1] Although Texas law authorizes both District Judges and County Judges to appoint Magistrate Judges, TEX. GOV'T CODE § 54.301, the federal district court found that the six defendant Magistrate Judges were appointed by the District Judges, report directly to them, and are subject to their policies and guidance. *Daves*, 341 F. Supp. 3d at 691. The court found that these Magistrate Judges do not report to the County Judges, but they do routinely follow the guidance and policies the County Judges create. *Id.*

[2] Along with so much else in this case, the details of the Plaintiffs' claims against each defendant are complicated. First, the Plaintiffs sued Dallas County as a municipal corporation for declaratory and injunctive relief. Second, they sued the Sheriff in her official capacity for declaratory and injunctive relief. Third, they sued the County Judges in their individual and official capacities for injunctive and declaratory relief. Fourth, they sued the District Judges in their individual and official capacities for injunctive and declaratory relief. Fifth, they sued the Magistrate Judges "for declaratory relief only," and did not indicate whether they sued the Magistrate Judges in their individual capacities, official capacities, or both.

No. 18-11368

injunction would prohibit Dallas County "from enforcing its wealth-based pretrial detention system" and require it "to provide the procedural safeguards and substantive findings that the Constitution requires before preventatively detaining any presumptively innocent individuals."

Early in the suit, the Defendants filed motions to dismiss due to a lack of jurisdiction, raising threshold defenses, and rejecting the case's merits. Among other points, Dallas County, the Sheriff, and the Magistrate Judges argued that none of the Defendants is a county policymaker sufficient for municipal liability. The District Judges argued that the Plaintiffs lack standing. The County Judges argued for abstention under *Younger v. Harris*, 401 U.S. 37 (1971), an argument incorporated by the District Judges and Magistrate Judges. No explicit ruling on the motions was made.

Central to this suit is that the District Judges in Dallas County promulgated a bail schedule for felony arrestees, which took effect in February 2017. In April 2017, the County Judges promulgated a bail schedule for misdemeanor arrestees. The district court explained that "[t]hese schedules operate like a menu, associating various 'prices' for release with different types of crimes and arrestees." *Daves*, 341 F. Supp. 3d at 692. Although the District Judges and County Judges insist that these schedules are non-binding recommendations,[3] the district court found that the "Magistrate Judges routinely treat these schedules as binding when determining bail" and that "[t]he schedules are the policy of Dallas

---

[3] The felony bail schedule is labeled "Recommended Bond Schedule." The felony bail schedule also states: "These are recommended amounts. Bonds may be set higher or lower than the amounts shown if justified by the facts of the case and the circumstances of the defendant." The misdemeanor bail schedule is labeled as "Dallas County Criminal Courts Revised Misdemeanor Bond Guidelines." It instructs Magistrate Judges that they "may set a bond in proportion to the facts of the alleged offense after evaluating the special circumstances concerning each offense."

County." *Id.* The Dallas County Sheriff implements Magistrate Judges' detention decisions at the facility where arrestees are detained. *Id.* at 691.

Soon after this suit was filed, this court issued opinions in an appeal from a preliminary injunction in a nearly identical challenge to the system of setting bail for misdemeanor arrestees in Harris County (in which Houston is located). *See ODonnell v. Harris Cnty.*, 882 F.3d 528 (5th Cir. 2018), *withdrawn and superseded on panel reh'g*, 892 F.3d 147 (5th Cir. 2018) (*ODonnell I*); *see also ODonnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018) (*ODonnell II*). The analysis in those opinions largely controlled, necessarily so, what the district court concluded in the present suit.

After the first opinion in *ODonnell*, the district court in this case had a hearing on the Plaintiffs' motion for a preliminary injunction. A month later, the court issued a memorandum opinion and entered an injunction in a separate order. The same day, the court also issued a memorandum opinion and order granting the Plaintiffs' motion for class certification, permitting the Plaintiffs to proceed on behalf of themselves and "[a]ll arrestees who are or will be detained in Dallas County custody because they are unable to pay a secured financial condition of release."

The district court held that this case was materially indistinguishable from *ODonnell I*, thereby accepting the *ODonnell I* court's legal conclusions as controlling for this case. *Daves*, 341 F. Supp. 3d at 691. The only threshold issue the court discussed was policymaking authority for municipal-liability purposes. *Id.* at 693. It did not make any holdings as to whether the Plaintiffs have standing, whether any Defendants were entitled to sovereign immunity, or whether to abstain under *Younger*.

The district court found that the bail system in Dallas County results in automatic detention for indigent arrestees that can last for months "solely because an individual cannot afford the secured condition of release," *i.e.*,

money bail. *Id.* Consequently, the district court held that the Plaintiffs demonstrated a likelihood of success on their procedural-due-process and equal-protection claims. *Id.* at 694–95. It rejected the Plaintiffs' claim that substantive due process requires a finding that no less intrusive condition of release would meet the state's interests in pretrial detention. *Id.* at 695–96.

The court then issued an injunction. Understandably, it was nearly identical to the *ODonnell* court's injunction. The County Judges and District Judges, along with Dallas County, were made subject to the injunction; the injunction stated, though, that no relief against the judges was granted "in their judicial or legislative capacities." The injunction required Dallas County to provide "an adequate process for ensuring there is individual consideration for each arrestee of whether another amount or condition provides sufficient sureties." Without being enjoined, the Sheriff was "authorized to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release . . . if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided."

The Plaintiffs, Dallas County, and the District Judges, each filed notices of appeal.[4] There was no appeal by the Magistrate Judges. Our panel opinion made some revisions to the injunction, but, bound by the *ODonnell* opinions, we affirmed in most part. *See Daves v. Dallas Cnty.*, 984 F.3d 381

---

[4] Dallas County, the County Judges, the Magistrate Judges, and the Sheriff were represented by the same counsel in the district court. Counsel for those Defendants filed a single notice of appeal indicating that "Defendant Dallas County, Texas," was appealing to this court. In appellate briefing, this counsel argued that Dallas County, the County Judges, and the Sheriff had no liability, but there is no argument specifically relating to the Magistrate Judges. The District Judges have been represented separately by the State of Texas.

(5th Cir. 2020), *vacated on petition for reh'g en banc*, 988 F.3d 834 (5th Cir. 2021).  Of course, we are now considering the appeal *en banc*.

After the May 2021 *en banc* oral argument, legislation was enacted that created new rules for the imposition of bail.  *See* Act of August 31, 2021, 87th Tex. Leg. 2d C.S., S.B. 6.  We asked for supplemental letter briefs addressing this legislation.  The Plaintiffs responded that the procedures for imposing bail on indigent pretrial arrestees remain constitutionally infirm, while Defendants argued that the new law makes it even clearer that the standards and procedures for imposition of pretrial bail are state-law matters.  All we decide at this point is that the new legislation does not eliminate the need for us to analyze the threshold issues that follow.  We will, though, also remand to the district court the initial resolution of the effect of this Senate Bill 6.

## DISCUSSION

The district court issued the preliminary injunction without making explicit holdings about justiciability or *Younger* abstention.  In fairness, the district court might reasonably have assumed that our then-recent opinions concerning Harris County bail practices had answered those questions.  As an *en banc* court, we see a need to analyze those issues afresh in this context of suits regarding county bail practices.

Deciding if a case should be allowed to proceed in federal court at all is an issue that should not be postponed indefinitely.  A federal "court has a continuing obligation to assure itself of its own jurisdiction, *sua sponte* if necessary."  *Green Valley Spec. Util. Dist. v. City of Schertz*, 969 F.3d 460, 480 (5th Cir. 2020) (en banc).  Our only question about analyzing these threshold questions concerns timing.  We have decided the time is now for considering justiciability and abstention.

We must resolve jurisdictional questions before reaching the merits of the case, but "there is no mandatory 'sequencing of jurisdictional issues.'"

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)).  Even though not a jurisdictional issue, a court may "abstain under *Younger v. Harris*, 401 U.S. 37 (1971), without deciding whether the parties present a case or controversy."  *Ruhrgas*, 526 U.S. at 585.  In addition, our sequencing of issues is affected by the fact this opinion is preliminary to and is intended to guide a limited remand.  In other words, we do not resolve all jurisdictional and abstention issues at this time.  We also consider it appropriate to analyze now whether any of the defendant officials were acting on behalf of Dallas County on bail matters.  If none of them were, then there is no subject-matter jurisdiction under Section 1983 against the County, as it is only through the actions of these defendant officials that the County itself could be liable to the Plaintiffs.

We will proceed in this order: (1) Were any Defendants acting on behalf of Dallas County?  (2) Do the Plaintiffs have standing to seek relief against any of the Defendants?  (3) Do *Younger* abstention principles prohibit federal judicial intervention in the Dallas County bail system?

I.      *Were any Defendants acting on behalf of Dallas County?*

Section 1983, which is the current version of Section 1 of the Civil Rights Act of 1871, allows suits against any "person" for violation of federal rights.  Municipalities, which include counties and certain other local governmental bodies, are "persons" under Section 1983.  *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 & n.54 (1978).  Suit may properly be brought against "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  States and their officials are not "persons" under Section 1983.  *Will v.*

*Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Whether state sovereign immunity as signified by the Eleventh Amendment applies to bar suit and whether an official is acting for the state and thus exempt from suit under Section 1983 involve different analyses. *Id.* at 66. Both of those questions are asked in this case.

Between those two related questions, the one we should answer before a remand is whether any of the officials are "persons" for purposes of Section 1983. That question is particularly relevant now because if all the Defendants were acting for the State, there is no case or controversy with, and no Article III jurisdiction over, Dallas County. Despite that we will not resolve any Eleventh Amendment issues now, we will briefly contrast the analysis we would use for those issues to that we will use in our Section 1983 inquiry.

For Eleventh Amendment immunity purposes, we apply these factors when deciding if a governmental body acts for the state:

> 1. Whether the state statutes and case law view the agency as an arm of the state; 2. The source of the entity's funding; 3. The entity's degree of local autonomy; 4. Whether the entity is concerned primarily with local as opposed to statewide problems; 5. Whether the entity has the authority to sue and be sued in its own name; and 6. Whether the entity has the right to hold and use property.

*Hudson v. City of New Orleans*, 174 F.3d 677, 681 (5th Cir. 1999) (line breaks removed).[5] We have stated that the source of funding is the most important factor in the Eleventh-Amendment analysis. *Id.* at 686–87. That importance

---

[5] Though the *Hudson* factors are not controlling on our issue, we mention that the state is required to provide funding to counties for judicial salaries: "Beginning on the first day of the state fiscal year, the state shall annually compensate each county in an amount equal to 60 percent of the state base salary paid to a district judge . . . for each statutory county court judge" who meets certain requirements. Tex. Gov't Code § 25.0015.

followed inexorably from our earlier analysis that "[t]he Eleventh Amendment was fashioned to protect against federal judgments requiring payment of money that would interfere with the state's fiscal autonomy and thus its political sovereignty." *Jagnandan v. Giles*, 538 F.2d 1166, 1176 (5th Cir. 1976). Ten years later, we identified the six factors that would be concisely restated in *Hudson. See Clark v. Tarrant Cnty.*, 798 F.2d 736 744–45 (5th Cir. 1986). We held that "an important goal of the Eleventh Amendment is the protection of state treasuries." *Id.* at 744. We cited *Jagnandan* for its focus on the fiscal effects of a suit against the state. *Id.*

In contrast, Section 1983 litigation requires us to identify the level of government for which an official was acting when establishing the policy that is relevant to the claims. *Jett*, 491 U.S. at 737. For purposes of Section 1983 personhood, it is state law that determines whether an official with final policymaking authority as to the specific function involved in the litigation is acting for a local governmental unit or the state. *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997). A determination "of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *Id.* Taking advantage of the alliteration opportunity, we summarize that *McMillian* holds we examine function, not funding, when deciding whether an official is acting for the state or local government in a case brought pursuant to Section 1983.

It is true that we considered the six *Hudson* factors when deciding whether the actions of a county board created liability for the county or the state when suit was brought against that board under Section 1983. *See Flores v. Cameron Cnty.*, 92 F.3d 258, 264–65 (5th Cir. 1996). We find it clear from the subsequent *McMillian* opinion, though, that reliance on those factors can be misleading in Section 1983 analysis. *McMillian*, 520 U.S. at 786. The focus under Section 1983 must be on discerning what state law provides as to the specific relevant function, *i.e.*, the act that is being

challenged in the litigation.  If we instead prioritize identifying the source of the overall funding or the primary concern of the entity or official, as *Hudson* demands, we will be focusing on generalities and not on the specifics of the relevant act.  The critical evidence from state law under *McMillian* is that relating to the specific conduct at issue in the lawsuit.

In *McMillian*, the parties agreed that an Alabama sheriff was a policymaker for law enforcement but disagreed about whether the sheriff made policy for the state or instead for the county.  *Id.* at 785.  The Court did not rely on the county's funding when determining the level of government for which policy was made; indeed, the Court held that the county's payment of the sheriff's salary and its providing "equipment (including cruisers), supplies, lodging, and reimbursement for expenses," were insignificant in the absence of showing the payments "translate into control over" the sheriff.  *Id.* at 791.  The Court referred for comparison to one of its decisions about the Eleventh Amendment from earlier in the same term.  *Id.* at 786 (citing *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425 (1997)).  The reference followed the Court's holding that for purposes of Section 1983, state law would control as to the function of the official; it then cited the following *Regents* footnote stating a different standard for the Eleventh Amendment: "Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law."  *Regents*, 519 U.S. at 429 n.5 (cited but not quoted in *McMillian*, 520 U.S. at 786).  Even that federal issue, though, "can be answered only after considering the provisions of state law that define the agency's character."  *Id.*

Before concluding, we return to our *Hudson* opinion on the Eleventh Amendment.  There we explained, similar to what the Supreme Court did in *McMillian*, that there are two different tests: "*McMillian* did not concern the

Eleventh Amendment.  Instead, it dealt with the issue of county liability in § 1983 lawsuits."  *Hudson*, 174 F.3d at 681 n.1.  We went on to hold that though "we look at the function of the officer being sued in the latter context, we do not in our Eleventh Amendment analysis." *Id.*

Finally, importantly, and obviously, the Supreme Court in *McMillian* stated how to determine in a Section 1983 suit whether an official was acting for a state or a local government.  Even if the *Hudson* opinion itself claimed it had relevance to that determination, though we hold it did not, nothing there can override a Supreme Court decision.

Our contrasting of analyses concluded, we now address the Section 1983 issues by examining the roles of the judges of the statutory county courts and of the district courts, and of the Sheriff.  Because the Magistrate Judges are not parties to this interlocutory appeal, we discuss them only briefly.

### A.    County Judges

Deciding if judges act for Texas or Dallas County when establishing a bail schedule for their court is a question of state law as applied to that specific function.  *See McMillian*, 520 U.S. at 786.  We restate that principle because the following reveals different results depending on context to the task of classifying statutory county court judges as county or state officers.

Our analysis of the role of the defendant County Judges proceeds in three steps.  First, we examine sections of the Texas constitution that designate county judges as "county officers" for certain purposes.  We explain that the judges named in the constitution are not the defendant County Judges, then show the connection between the two.  Second, we explain that the state constitution and statutes compel a finding that defendant County Judges act for the state at times.  Finally, we determine that creation of a bail schedule is one of those times.

No. 18-11368

*1. Relationship of constitutional and statutory county judges*

The Texas constitution provides for one county court with one judge in each county. TEX. CONST. art. V, § 15 (1876). Another section of the constitution lists those judges as among the "county officers" who are subject to a specific removal procedure:

> County Judges, county attorneys, clerks of the District and County Courts, justices of the peace, constables, and other county officers, may be removed by the Judges of the District Courts for incompetency, official misconduct, habitual drunkenness, or other causes defined by law, upon the cause therefor being set forth in writing and the finding of its truth by a jury.

*Id.* § 24. The county judges named there are not the County Judges sued here. The Texas constitution's county judges have such "judicial functions as provided by law." *Id.* § 16. The judge also presides over the county's five-member governing body. *Id.* § 18(b). Thus, that county judge "is not a judicial officer only. . . . [T]here are various executive and ministerial functions conferred" as well. *Clark v. Finley*, 54 S.W. 343, 347 (Tex. 1899).

In contrast, the 11 defendant County Judges[6] hold judicial, not hybrid, statutory offices: "the Legislature has created statutory county courts at law in more populous counties to aid the single county court in its *judicial* functions."[7] Indeed, "the judge of a statutory county court has no authority over the county's administrative business that is performed by the county

---

[6] They are Dallas County *Criminal* Court judges. *See* TEX. GOV'T CODE § 25.0591(b). Categories of statutory county courts are listed in TEX. GOV'T CODE § 21.009(2).

[7] *About Texas Courts*, *County Courts at Law*, TEXAS JUDICIAL BRANCH, https://www.txcourts.gov/about-texas-courts/trial-courts/ (emphasis added).

judge."[8] TEX. GOV'T CODE § 25.0004(d). The first statutory county court in the state was created in 1907 because "the business of the County Court of Dallas County is so large as to render it impossible for said court to dispose thereof"; the constitutional county court's jurisdiction over its court cases except for probate matters was given to the new court. Act approved April 3, 1907, 30th Leg., R.S., ch. 52, §§ 1-3 & 14, 1907 TEX. GEN. LAWS 115–17; *see Camacho v. Samaniego*, 831 S.W. 2d 804, 810 (Tex. 1992) (stating that this Act created the first statutory county court). In 2021, 91 of the state's 254 counties had statutory county courts with varied jurisdiction.[9]

We must decide, then, whether statutory and constitutional county judges are sufficiently similar to make Article V, Section 24's label of "county officers" apply to both. We start with the fact that statutory county courts originated under legislative authority to create new courts and change "the civil and criminal jurisdiction" of a constitutional county court. *See Johnson v. City of Dallas*, 78 S.W. 2d 265, 268 (Tex. Civ. App.—Dallas 1934, writ ref'd) (holding that "no special county court is given powers other than were committed to [constitutional] county courts").[10] It was said that

---

[8] This statutory sentence begins: "Except as provided in Subsection (e)"; the proviso allowed delegation of authority to a statutory county judge to hear applications for permits under three sections of the Alcoholic Beverage Code. TEX. GOV'T CODE § 25.0004(d) & (e). Those three sections were repealed, making the exception vestigial. *See* Acts 2019, 86th Tex. Leg., R.S., ch. 1359, § 411(a), 2019 TEX. GEN. LAWS 4992, 5120–21.

[9] *Court Structure of Texas*, TEXAS JUDICIAL BRANCH, (Sept. 2021), https://www.txcourts.gov/media/1452712/court-structure-chart-september-2021.pdf. Those 91 counties have 255 statutory county courts; three more counties share a single such court. *Id.*; *see* TEX. GOV'T CODE § 25.2702.

[10] Citing TEX. CONST. art. V, §§ 1 & 22 (as amended 1891). Section 22, allowing the Legislature to "increase, diminish or change the civil and criminal jurisdiction of County Courts," was repealed when voters endorsed Tex. S.J. Res. 14, § 9, 69th Leg., R.S., 1985 TEX. GEN. LAWS 3355, 3359, & C-20. *See* Tex. Gov. Proclamation No. 41-2057 (Dec. 13, 1985) (declaring that the constitutional amendment proposed by S.J. Res. 14 was

statutory courts "are not courts 'other' than those named in the Constitution, in the sense that they are of wholly differing functions, but rather courts of the same kind, but with divided powers." *State ex rel. Peden v. Valentine*, 198 S.W. 1006, 1008 (Tex. Civ. App.—Fort Worth 1917, writ ref'd). Statutory county courts "are essentially . . . county courts within the meaning of the Constitution." *Id.*; *accord Johnson*, 78 S.W. 2d at 267.

As those cases indicate, jurisdiction legislatively given to statutory county courts "was for many years confined to a portion of that constitutionally granted to constitutional county courts"; the legislature later abandoned those limits. *Camacho*, 831 S.W. 2d at 810. However, even when the legislature grants jurisdiction to a statutory county court that is beyond that of a constitutional county court, its judge is still a county officer subject to provisions such as those for removal and requiring residence in the county. *Jordan v. Crudgington*, 231 S.W.2d 641, 645–46 (Tex. 1950).

We rely on *Valentine*, *Johnson*, and *Jordan* to conclude that the defendant County Judges are "county officers" at least for purposes of removal under the above-quoted Section 24 of the judicial article, either because their judgeships are derivative of those for the "county judges" named first in that section or because they are among the "other county officers" named last.

### 2. County Judges can act for the State

The second step in our analysis is to determine if the defendant County Judges can act for the state and, if so, when. The *ODonnell* court relied solely on the state constitution's section on removal of county officers to conclude that "Texas law explicitly establishes that the [statutory County]

---

approved in the Nov. 5, 1985 election) (from records of Tex. Sec. of State, on file at Tex. State Archives; located with assistance of Nicholas de la Garza, Texas Legislative Council).

No. 18-11368

Judges are 'county officers.'" *ODonnell I*, 892 F.3d at 155 (citing Tex. Const. art. V, § 24). We agree that these statutory judges are county officers under some of the Texas constitution's organizing directives such as being placed with local officials removable by a district judge. Removal of certain other officials — including judges of the district and all higher-level courts — requires legislative action. Tex. Const. art. XV, § 2. Our question, though, is for whom statutory county judges act as to bail. The answer is not found by grouping these judges in an "'all or nothing' manner." *McMillian*, 520 U.S. at 785. Long ago, we rejected "all or nothing" when we held that a single county judge under the constitution, there grouped with "county officers," acted for the state when using authority delegated by state statute to compel disclosure of the names of those who had organized a school boycott. *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980).[11]

A helpful foundation for our analysis is that local judges are part of a state system: "in a general sense, and perhaps for special purposes, all the [statutory county and district] courts named [in the opinion] are state courts, and their presiding judges state officers." *Valentine*, 198 S.W. at 1008. The contested issue in that case, though, was whether the statute for filling vacancies in state offices or the one for vacancies in county offices applied to a specific statutory county court judgeship. *Id.* at 1007–08. The court held that it was the statute for county offices. *Id.* at 1009.

---

[11] No comparable ruling by the Supreme Court of Texas regarding county judges seems to exist, but that court has held that even when the judicial article of the constitution classified officials as "county officers," they could be "in fact officers of the state" when exercising some of their powers. *See Clark*, 54 S.W. at 347; *see also Fears v. Nacogdoches Cnty.*, 9 S.W. 265, 266 (Tex. 1888) (holding that a justice of the peace when serving as an *ex officio* coroner "acts for the state, and not for the county"). Similarly, a county treasurer is a state official when exercising certain powers. *Jernigan v. Finley*, 38 S.W. 24, 25 (Tex. 1896).

To determine whether the defendant statutory County Judges can act for the State, we apply guidance from *McMillian*.  There, the strong connection between Alabama sheriffs and their counties was undeniable: the county paid the sheriff's salary and provided vehicles; the sheriff's jurisdiction was limited to the county; county voters elected the sheriff.  520 U.S. at 791.  Here, the Plaintiffs identify strong, related connections between the statutory County Judges and their county.  The Supreme Court, though, held that more important than such matters as funding and limits on jurisdiction is that the Alabama constitution provided that county sheriffs were part of the executive department of state government, meaning that they acted for the state when exercising their law enforcement powers. *Id.* at 788 (citing Ala. Const. art. V, § 112 (1901)).

We find a similarly edifying structural plan in the Texas constitution, applicable both to county and district judges when they exercise judicial powers.  Most relevant, and analogous to the Alabama provision for sheriffs, is that Texas law divides *state* judicial power among the different courts:

> Sec. 1. *The judicial power of this State* shall be vested in one Supreme Court, in one Court of Criminal Appeals, in Courts of Appeals, in District Courts, in *County Courts*, in Commissioners Courts, in Courts of Justices of the Peace, and in such other courts as may be provided by law.
>
> The Legislature may establish such other courts as it may deem necessary and prescribe the jurisdiction and organization thereof, and may conform the jurisdiction of the district and other inferior courts thereto.

Tex. Const. art. V, § 1 (emphasis added).

Learned commentary — and learned colleagues in dissent — assert that the list in the first paragraph of Section 1 of those who have judicial

power is over-inclusive.[12] We agree, up to a point. The commissioners court, which is a county's chief administrative body, is not generally, if ever, exercising judicial power. Even if there is another listed court not exercising judicial power, we can see no distinction on this point among the appellate courts, the District Courts, and the statutory County Courts. We explain.

We start with the fact that once again, the county courts named there are those established by the constitution. However, statutory county courts are also vested with state judicial power. That was clear when the first statutory county court in the state was granted "jurisdiction in all matters . . . over which, by the general laws of the State, the County Court of said county would have jurisdiction," with exceptions. 1907 TEX. GEN. LAWS 115. That was a grant of part of the constitutional court's state judicial power. More generally, when the legislature creates statutory county courts, defines their jurisdiction, then "conform[s]" other courts' jurisdiction to that of the new courts, the state's judicial power is being "vested . . . in such other courts as may be provided by law." *See* TEX. CONST. art. V, § 1.

A few other statutes are also relevant in understanding the level of government for which these courts act. First, though, a caveat — individual statutory county courts are created by their own, separate legislation.

---

[12] A book-length examination of every section of the 1876 Texas Constitution was prepared by a legal consultant and a small group of law professors and attorneys to assist a state constitutional convention held in 1974; the new constitution drafted by the convention was not adopted, but the commentary was later published. *See* GEORGE D. BRADEN, ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS v–viii (1977). The commentary viewed the list in the first paragraph of Article V, section 1, as being both over- and under-inclusive. *Id.* at 365. Only the commissioners court was identified as not being part of the "state judicial system." *Id.* The commentary then stated that the statutory county courts are among those not named that do exercise "judicial power." *Id.* at 365–66. The commentary did not spend time on whether county courts exercise *state* judicial power, but neither did it question the accuracy of the language of Article V, section 1 that state judicial power was assigned to the courts that were correctly named or were later provided by law.

No. 18-11368

Accordingly, a general section of the Government Code begins by stating that the Code "applies to each statutory county court in this state. If a provision of this subchapter conflicts with a specific provision for a particular court or county, the specific provision controls." Tex. Gov't Code § 25.0001(a). The only *en banc* brief to cite specific statutes for Dallas County was for the District Judges, but it identifies no conflicts with the general statutes. Thus, we consider general statutes with the exception that we begin by quoting the specific statute that establishes the defendant County Judges' jurisdiction.

"A county criminal court in Dallas County has the criminal jurisdiction, original and appellate, provided by the constitution and law for county courts." *Id.* § 25.0593(a). The jurisdiction prescribed by law for the constitutional county courts includes "exclusive original jurisdiction of misdemeanors" with some exceptions. *Id.* § 26.045(a). Bolstering our understanding that statutory county courts occupy an independent level of the state judicial hierarchy is that appeals from their decisions in criminal cases are taken to a state court of appeals. Tex. Code Crim. Proc. art. 4.03. Thus, it is clear that the defendant County Judges have authority over a category of criminal offenses established by state statutes.

Even the *McMillian* dissent supports this analysis. Though disputing that Alabama sheriffs were state officials, Justice Ginsburg readily agreed to the placement of the different levels of judges within the state judicial system:

> *Unlike judges who work within the State's judicial hierarchy*, or prosecutors who belong to a prosecutorial corps superintended by the State's Attorney General, sheriffs are not part of a state command and serve under no "State Sheriff General."

*McMillian*, 520 U.S. at 796, 797 (Ginsburg, J., dissenting) (emphasis added). We have expressed a similar understanding: "a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992). This

21

holding confirms the "general sense" that when judges are engaged in their judicial functions, they are state actors. *See Valentine*, 198 S.W. at 1008.

### 3. Creation of bail schedule was a judicial act for the State

The final step in our analysis is to decide if creating this bail schedule was a judicial act that applied state law. Adversary proceedings commence when an arrestee appears before a judicial officer and "learns the charge against him and [that] his liberty is subject to restriction." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 213 (2008). A judge's setting an arrestee's bail at that time is part of the state adversary proceedings and a judicial function. The question for us is whether creating a bail schedule for later application to specific arrestees is also a judicial act that enforces state law.

The precedent that provides the most assistance on this issue involved a county's trial judges' creation of a system for selecting attorneys for later appointment to felony criminal cases. *See Davis v. Tarrant Cnty.*, 565 F.3d 214, 218–19 (5th Cir. 2009). In determining whether the judges had engaged in a judicial act as opposed to an administrative or other category of action, we considered "the particular act's relation to a general function normally performed by a judge." *Id.* at 221–22 (quoting *Mireles v. Waco*, 502 U.S. 9, 13 (1991)). We then mentioned four factors the circuit has used "for determining whether a judge's actions were judicial in nature": was a "normal judicial function" involved; did the relevant act occur in or adjacent to a court room; did the "controversy" involve a pending case in some manner; and did the act arise "directly out of a visit to the judge in his official capacity." *Id.* at 222. The factors were taken from a precedent analyzing whether a judge was entitled to absolute judicial immunity for her actions. *Id.* at 222–23 (citing *Ballard v. Wall*, 413 F.2d 510, 515 (5th Cir. 2005)).

Though identifying four factors, we used only the first one and held that the "appointment of counsel for indigent defendants in criminal cases is

a normal judicial function." *Id.* at 223. We acknowledged that the challenged act in the case was not a single appointment of an attorney in a single case. *Id.* Nonetheless, "the act of selecting applicants for inclusion on a rotating list of attorneys eligible for court appointments is inextricably linked to and cannot be separated from the act of appointing counsel in a particular case, which is clearly a judicial act." *Id.* at 226.

The *Davis* opinion was correct in its approach. Implicitly, it concluded that there are factual situations in which it makes sense not to consider multiple factors[13] but just to focus on an overarching point: when judges decide on a procedure for taking what indisputably will be judicial acts in the future, that decision is so intertwined with what will follow as to be a judicial act as well. That form of analysis applies equally here. The creation of bail schedules was no more or less divorced from setting bail in a specific case than establishing a method for selecting counsel was divorced from appointment of counsel in a specific case. We do acknowledge one difference: in *Davis*, the judges establishing the procedure were also the ones appointing counsel. Here, the bail schedules were created by judges other than those who would later set bail for individual arrestees. A difference, but we see no distinction. The unbroken linkage conceptually remains between the two. Thus, the act of creating guidance for setting bail is "inextricably linked" to the subsequent setting of bail and is a judicial act. *Id.*

We also conclude that it was the judicial power of the state that was being used: the Texas constitution provides that judges exercise state judicial

---

[13] We trace the origin of the factors to another judicial immunity case, which prefaced the enumeration by saying "we discern in this case four factors that, when taken together, compel the conclusion" that the judge was acting in a judicial capacity. *McAlester v. Brown*, 469 F.2d 1280, 1282 (5th Cir. 1972). Originally, then, these four factors were case-specific and not a generic test. As the *Davis* court seemingly recognized, the test will not always apply beyond evaluating a judge's actions in one case or in other limited circumstances.

power generally, TEX. CONST. art. V, § 1; bail is a right granted by the state constitution, *id.* art. I, § 11; and the process for determining bail is controlled by state statutes, *see, e.g.*, TEX. CODE CRIM. PROC. art. 17.01–17.49 (detailing rights and procedures regarding bail).

In summary, if the issue were the removal, replacement, or required residence of statutory county judges, the laws about county officers would control. Instead, we are concerned with decisions made in a judicial capacity by judges "within the State's judicial hierarchy" to develop a bail schedule applicable at the "start of adversary judicial proceedings." *See Rothgery*, 554 U.S. at 213. It does not matter that the schedule applies only to one county. The geographic limit of their action does not define the level of government for which the judges acted. *See McMillian*, 520 U.S. at 791 (holding that even though "the sheriff's jurisdiction is limited to the borders of his county," the sheriff was a state official). We hold that, under the Texas constitution, the judges were exercising state judicial power and thus acting for the state.

We reverse the district court's holding that these 11 defendant County Judges were acting for Dallas County when addressing issues of bail. We also overrule the *ODonnell* opinions on this issue.

### B.    *District Judges*

Much of the foregoing analysis concerning County Judges applies to the District Judges as well. There is, though, a different constitutional section to consider. It makes clear that district courts are part of a statewide system: "The State shall be divided into judicial districts, with each district having one or more Judges as may be provided by law or by this Constitution." TEX. CONST. art. V, § 7.

Additional relevant analysis was in the panel opinion in this case. *Daves*, 984 F.3d at 397, *vacated*, 988 F.3d 834. We do not see error in the panel's discussion. We summarize some of it here. It is evident that the

No. 18-11368

state district courts are one level of the state judicial system, with appeals in most cases to a state court of appeals and possible review by Texas's Supreme Court or Court of Criminal Appeals. For an understanding of district courts, we quote the official Texas Judicial Branch website, which states:

> The district courts are the trial courts of general jurisdiction of Texas. The geographical area served by each court is established by the Legislature, but each county must be served by at least one district court. In sparsely populated areas of the State, several counties may be served by a single district court, while an urban county may be served by many district courts.

*About Texas Courts*, *District Courts, supra* note 7. Ten of the seventeen defendant District Judges are identified in the pleadings as judges of District Courts and seven as judges of Criminal District Courts.

Also relevant is our earlier holding that for purposes of appointing counsel for indigent criminal defendants, the state district court judges act for the State. *See Clanton v. Harris Cnty.*, 893 F.2d 757, 758 (5th Cir. 1990). We relied on a precedent which held that Texas district judges "are undeniably elected state officials." *Id.* (quoting *Clark v. Tarrant Cnty.*, 798 F.2d 736, 744 (5th Cir. 1986)).

We conclude that when these district judges made a bail schedule, they acted as officers of the state judicial system. The federal district court, though, held that these judges were county officers. The court relied on our earlier rulings about statutory county judges in Harris County and found no need to reason further about this additional category of judges. *See ODonnell I*, 892 F.3d at 155–56. We have already explained our disagreement with the *ODonnell* holding, and we reject applying similar reasoning to District Judges. Because these District Judges acted for the State when addressing bail, we reverse the lower court's contrary holding.

### C.    Magistrate Judges

The federal district court found that the six defendant Magistrate Judges are hired, and can be fired, by the state District Judges. *Daves*, 341 F. Supp. 3d at 691.  That court also found that these six Magistrate Judges routinely follow the guidance and policies the District Judges distribute. *Id.*

These six Magistrate Judges were not made subject to the preliminary injunction.  That could be the reason those judges did not join in the current interlocutory appeal.  Regardless, the Magistrate Judges are not parties to this appeal, and we do not determine whether they are state or county officials.

### D.    Dallas County Sheriff

The current version of the Texas constitutional provision providing for the position of sheriff is this:

> There shall be elected by the qualified voters of each county a Sheriff, who shall hold his office for the term of four years, whose duties, qualifications, perquisites, and fees of office, shall be prescribed by the Legislature, and vacancies in whose office shall be filled by the Commissioners Court until the next general election.

TEX. CONST. art. V, § 23.  We have found no provision in Texas law comparable to what the *McMillian* Court used in explaining that Alabama sheriffs were part of the state executive department.

We examine the appellate briefing to see if any party analyzed how to classify the Sheriff.  The section of Defendants' panel brief discussing the Sheriff does not analyze how to determine if she is a state or county official. It does remark that one of the *ODonnell* opinions had held that "the Sheriff was not a municipal policymaker, a point which the Plaintiffs do not contest." The brief also argues that the Sheriff does not make bail policy.  That is an argument about causation and redressability, which are components of

standing. The closest to an argument that the Sheriff is a state actor is that Dallas County's *en banc* brief responds to the panel's consideration of *Ex parte Young*, which is inapplicable except to suits against those acting on behalf of the State. In summary, the primary argument is that inclusion of the Sheriff in the suit is unnecessary for injunctive relief.

Plaintiffs do not provide any analysis about the Sheriff in their *en banc* briefing. To the panel, Plaintiffs' briefing contains only two pages about the Sheriff, saying (without arguing the contrary) that even if the Sheriff is not a county policymaker as to bail, she can be enjoined under Section 1983 "from enforcing constitutional violations." In the absence of any helpful briefing on whether the Dallas Sheriff for the purposes of the issues in this suit should be considered a state or county official, we leave the issue for later.

## II.    *Are there proper defendants for declaratory or injunctive relief?*

The subject-matter jurisdiction of federal courts is limited to "Cases" and "Controversies." U.S. CONST. art. III, § 2. "[A]n essential and unchanging part of the case-or-controversy requirement of Article III" is the requirement that the plaintiff establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, the plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Stated differently, the plaintiff must demonstrate "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

A plaintiff "bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. At the preliminary-injunction stage, "the plaintiffs must

make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Further, standing is not determined "in gross." *Davis v. Federal Elec. Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). To the contrary, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quotation marks and citation omitted). In this class action, for each named defendant, at least one named plaintiff must have standing to sue. *See Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017); *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012). Standing to sue one defendant does not, on its own, confer standing to sue a different defendant.

The Plaintiffs sued District Judges, County Judges, Magistrate Judges, the Sheriff, and Dallas County. Determining whether the Plaintiffs have standing to sue any of them is the task of this section. Of course, we have just held that the District and County Judges acted for the State when they created bail schedules and thus cannot create liability for Dallas County for those actions. We did not, though, then consider whether, to the extent of their acting for the State, the District and County Judges could be enjoined or become the subjects of declaratory relief under *Ex parte Young*, 209 U.S. 123 (1908). Consequently, standing to sue those two groups of judges remains relevant, as is standing to sue the other Defendants.

### A.    *Standing to sue the District Judges and County Judges*

We start with determining standing as to the claims against the District Judges and the County Judges. Of particular importance in our analysis is whether any plaintiff has claimed an injury that is "fairly traceable" to the unconstitutional conduct of one of these two groups of judges. *DaimlerChrysler Corp.*, 547 U.S. at 342. The Plaintiffs allege that: (1) the "Defendants" violate equal protection and substantive due process by

No. 18-11368

"jailing a person because of her inability to make a monetary payment"; and (2) the "Defendants" violate procedural due process by "depriving anyone of the fundamental right to pretrial liberty without" robust procedural safeguards. The injury that each named plaintiff claims is pretrial incarceration due solely to the inability to pay the automatically imposed amount of secured money bail.

We look at what the District and County Judges did, then decide whether the claimed injury is traceable to their actions. The claim is that bail schedules, made by these judges, were applied by the Magistrate Judges in a manner that causes constitutional injury. There is nothing unconstitutional about the mere promulgation and use of bail schedules. *See Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc). As the district court found, these bail schedules offer only "recommended" amounts. The bail schedules are not the source of the Plaintiffs' injuries. Rather, as the district court also found, the claimed injury derives from the Magistrate Judges' "policy of routinely relying on the schedules."

Standing "is ordinarily 'substantially more difficult' to establish" when "a causal relation between injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan*, 504 U.S. at 562). The Supreme Court is "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). In such circumstances, the plaintiff must show "that third parties will likely react in predictable ways." *California*, 141 S. Ct. at 2117 (quoting *Department of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)).

Here, the district court found that Magistrate Judges "treat" the bail schedules as binding, despite that the schedules offer only recommendations. Yes, Magistrate Judges are surrogates; they assist the district judges; many

of their decisions are tentative until reviewed. Those are not reasons that the Magistrate Judges could have been expected, after receiving bail schedules that were to be applied with discretion once the circumstances of the offense were considered, to feel free to apply them without discretion. The fact that a schedule could simplify the setting of bail when applied rigidly did not make such rigidity likely and therefore predictable. A reasonable prediction would have been just the opposite: if the District and County Judges told the Magistrate Judges to exercise discretion, they likely would react by doing so. Support for the latter prediction is that state law required, among other things, that any judge setting bail evaluate a detainee's "ability to make bail." TEX. CODE CRIM. PRO. art. 17.15. On this record, then, we cannot agree that it was predictable that the discretion urged by the schedules themselves and required by state law would not be exercised.

The Plaintiffs also rely on two Supreme Court opinions. The first case involved the Fish and Wildlife Service, which issued a "Biological Opinion explaining how the proposed action will affect the species or its habitat." *Bennett v. Spear*, 520 U.S. 154, 158 (1997) (parenthesis omitted). The Opinion had a "virtually determinative effect" on the actions of the third party to whom it was issued. *Id.* at 170. The Opinion informed the third party that "[t]he measures described [in the Opinion] are nondiscretionary." *Id.* (first alteration in original). Deviation from those terms subjected the third party "to substantial civil and criminal penalties, including imprisonment." *Id.* Here, the bail schedules lack those coercive enforcement mechanisms, making *Bennett* quite relevant but only for its contrast to our facts.

The second precedent concerned a citizenship inquiry on the 2020 census questionnaire; some states and other plaintiffs claimed they would be injured because the inclusion of the citizenship question would suppress participation and reporting. *Department of Com.*, 139 S. Ct. at 2562–65. The Department argued there was no causation because the plaintiffs' injuries

were traceable only to the actions of the people who chose not to respond to the census. *Id.* at 2565. The Court disagreed and held that the plaintiffs "met their burden of showing that third parties will likely react in predictable ways to the citizenship question" by providing studies showing a statistical likelihood of under-participation due to the citizenship question. *Id.* at 2566. As a result, the plaintiffs' theory of standing did "not rest on mere speculation about the decisions of third parties" but "on the predictable effect of Government action on the decisions of third parties." *Id.* The Plaintiffs discern similar predictive effects here based on the District Judges' power to remove these Magistrate Judges, causing the latter to feel pressure to apply the schedules rigidly. We earlier observed that any implicit pressure on the Magistrate Judges from those who could remove them would reasonably have been to comply with guidance to use discretion as to bail.

In summary, the Plaintiffs offer no evidence or law that the District and County Judges should have predicted that the Magistrate Judges would have treated the bail schedules as binding. The Plaintiffs' theory of causation applicable to the District Judges and the County Judges is too speculative to support standing. *See California*, 141 S. Ct. at 2117. Justiciability, if it exists, must be based on claims against another defendant.

In light of our rejection of the Plaintiffs' standing regarding these two categories of judges, we now address the preliminary injunction. The only parties enjoined were the District Judges, the County Judges, and Dallas County, as well as their "respective officers, agents, attorneys, and employees, and all those acting in active concert with them." An injunction must be vacated when the plaintiffs lack standing to sue any defendant against whom injunctive relief can be given. *See Barber*, 860 F.3d at 358 (reversing grant of preliminary injunction because the plaintiffs lacked standing).

Because the Plaintiffs in this case lack standing to sue the District and County Judges, there can be no liability for Dallas County arising from their

actions. We therefore need not consider, had they as state actors been properly joined, how to apply *Ex parte Young*, 209 U.S. 123. The dissent addresses the recent Supreme Court opinion that sheds further light on *Young. See Whole Women's Health v. Jackson*, 142 S. Ct. 522 (2021). Due to the limits of what we resolve, we need not discuss that case.

The current injunction cannot stand against the only officials subject to it. Accordingly, the district court's preliminary injunction is vacated.

### B.    *Standing to sue the Magistrate Judges*

The Plaintiffs sued the Magistrate Judges only for declaratory relief. The only declaratory relief sought as to the Magistrate Judges is the same declaration sought against all Defendants, namely:

> Defendants violate the Named Plaintiffs' and class members' constitutional rights by operating a system of wealth-based detention that keeps them in jail because they cannot afford to pay a secured financial condition of release required without an inquiry into or findings concerning ability to pay, without consideration of nonfinancial alternatives, and without findings that a particular release condition — or pretrial detention — is necessary to meet a compelling government interest.

The district court declined to determine whether the Magistrate Judges were proper defendants. Further, the Magistrate Judges were not made subject to the injunction. Instead, the district court concluded in its opinion issued the same day as the injunction that because those judges were acting on behalf of the county, any injunctive relief "against the County would reach the Magistrate Judges." *Daves*, 341 F. Supp. 3d at 693. We express no opinion on whether that conclusion was correct.

Our analysis so far suggests that causation for the claimed injuries might be traced to the Magistrate Judges. No party, though, has briefed on appeal whether federal jurisdiction exists over the claims against the

Magistrate Judges. In district court, the Magistrate Judges filed their own motion to dismiss. There they argued that the "Plaintiffs fail to identify the capacity in which the Magistrate Judges are sued," and asserted they were not policymakers as to bail and just followed the direction of the District and County Judges. They also adopted by reference the arguments in the County Judges' motion to dismiss. Among other arguments, the County Judges sought abstention under *Younger*, 401 U.S. 37; by adoption, the Magistrate Judges did too. The district court, of course, has not yet resolved the issue of *Younger* abstention.

We close this section with an observation. Available relief against any defendant judge is limited by a 1996 amendment to Section 1983 "that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (amended by Pub. L. No. 104–317, tit. III, § 309(c), 110 Stat. 3847, 3853 (Oct. 19, 1996)). How, if at all, that limitation affects the analysis of abstention can be considered on remand.

### C. *Standing to sue the Sheriff and Dallas County*

As to the Sheriff, the Plaintiffs sought injunctive relief and the same declaration that we earlier quoted. The district court held that the Sheriff was not a proper defendant. *Daves*, 341 F. Supp. 3d at 694. The panel opinion, now withdrawn, held she was a proper defendant. *Daves*, 984 F.3d at 405. Whether the sheriff should be party will primarily turn on whether injury is traceable to the Sheriff and can be redressed. Regarding Dallas County, if there is no defendant county official who acts as a policymaker as to the function at issue, then the County must be dismissed as a party. *See McMillian*, 520 U.S. at 783. There is no need now to resolve whether there

is standing to sue the Sheriff or to make the County a party. We will analyze that issue after the case returns to us following our remand on abstention.

### III.    Younger *abstention*

#### A. *Waiver of abstention*

Our final discussion concerns abstention. We start with whether that issue is even before us. One result of the principle that abstention under *Younger* is not jurisdictional is that application of the doctrine can be waived. *See Texas Ass'n of Bus. v. Earle*, 388 F.3d 515, 519 (5th Cir. 2004). When a "[s]tate voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system." *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 480 (1977). "Voluntarily" would also be the correct concept for when a state argument about abstention in district court is inconsequential.

Certainly, *Younger* has been barely mentioned in most of the briefing. Working backward temporally, none of the parties' *en banc* briefing cited *Younger*, though the brief for the Defendants cited a Fifth Circuit opinion that analyzed abstention by discussing a post-*Younger* opinion. *See Tarter v. Hury*, 646 F.2d 1010, 1013–14 (5th Cir. Unit A June 1981) (citing *O'Shea v. Littleton*, 414 U.S. 488 (1974)). In light of the apparent lack of anticipation of the issue, we notified counsel before oral argument to be prepared to discuss *Younger*.

In the briefing before the panel, Dallas County argued that comity bars the Plaintiffs' requested relief and attempted to distinguish *ODonnell I*. The District Judges argued, in a footnote of their brief, that Plaintiffs' requested relief "runs headlong into *Younger* abstention." The Plaintiffs responded that abstention was improper and foreclosed by *ODonnell I*, because the Magistrate Judges' bail determinations are not properly reviewable in the state criminal proceedings.

No. 18-11368

The earliest briefing was in district court.  Only the County Judges meaningfully briefed *Younger* as a threshold defense.  Perhaps the relative silence as to abstention can be explained by the fact that our court's first *ODonnell* opinion, which rejected *Younger* abstention in the similar context of bail practices in Harris County, was handed down on February 14, 2018, a month after this suit was brought but before motions to dismiss were filed. *See ODonnell*, 882 F.3d at 538–39, *withdrawn and superseded on panel reh'g*, *ODonnell I*, 892 F.3d 147.  We rejected abstention because we found arrestees did not have an adequate opportunity to make constitutional challenges in the state criminal proceedings.  *ODonnell*, 882 F.3d at 539.  The Defendants' motions to dismiss in this case were filed six weeks later on April 2, 2018.

The County Judges made *Younger* a significant part of their motion to dismiss.  They sought to distinguish *ODonnell* by arguing that, because this case involves felony arrestees and *ODonnell* dealt only with misdemeanants, the lengthier time those accused of felonies would be in jail would give them "ample opportunity to avail [themselves] of *habeas corpus*."

The District Judges filed three motions to dismiss.  The first two were filed on the same day as the County Judges' motion but made no similar argument about *Younger*.  The third, an "amended motion to dismiss," adopted and incorporated by reference the County Judges' arguments in favor of dismissal.  All the motions made the same two indirect arguments about abstention.  First, each motion stated that "[f]ederal courts have long recognized that state courts are just as capable of adjudicating federal constitutional issues as are federal courts," citing *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982).  Second, each motion insisted that "[s]tate judges are not presumed to be incapable of understanding or applying the federal constitution," citing *Middlesex* and in a long string cite with brief parentheticals referring to cases such as *Moore v.*

35

*Sims*, 442 U.S. 415 (1979).  Explicit analysis of *Younger* abstention was absent.  The district court has not ruled on any of the motions to dismiss.

In deciding whether *Younger* is properly before us, we start with this court's rejection of any bright-line rule for when waiver blocks an issue and when waiver has been evaded.  *First United Fin. Corp. v. Specialty Oil Co.*, 5 F.3d 944, 948 n.9 (5th Cir. 1993).  We determine, first, whether the issue was presented to the district court in a manner sufficient to give that court an opportunity to rule on it.  *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 89 (5th Cir. 2011).  The issue must then be "press[ed]" on appeal.  *Texas Democratic Party v. Abbott*, 978 F.3d 168, 177 (5th Cir. 2020).

In summary, one group of Defendants in this case argued in district court a distinction from *ODonnell*'s holding about *Younger*.  Other Defendants' motions buried the abstention argument but did cite caselaw of secondary importance.  The district court's rejection of any argument under *Younger* would reasonably have appeared preordained, making pursuing an early ruling on abstention in district court seemingly futile.

Further, before us now are only those matters related to an interlocutory appeal from the grant of a preliminary injunction, when no ruling on abstention has yet been made.  It was necessary to raise the issue in district court even if foreclosed, but on these facts, we do not see that any party needed to do more to have preserved the issue.

As to briefing for the interlocutory appeal, it was potentially unclear whether *Younger* would concern the panel, bound as it was by *ODonnell*.  Even so, *Younger* was discussed in the initial briefing.  Finally, though *en banc* is the quintessentially appropriate time to challenge a precedential Fifth Circuit opinion's holding about any relevant issue, our order granting rehearing in this appeal stated that the briefing schedule is "for the filing of *supplemental* briefs."  Whatever else that might mean, it supports that

arguments do not need to be restated if they have been sufficiently pressed in the briefing to the panel. Minimal arguments were in the panel briefing.

We conclude that the *Younger* issue has not been waived.

### B. Remand for consideration of abstention.

A few observations about abstention need to be made. "Jurisdiction existing," the Supreme Court has explained, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The abstention doctrine identified in *Younger* is an "exception to this general rule." *Id.*

In *Younger*, a defendant in a pending state criminal prosecution filed a federal lawsuit challenging the facial constitutionality of the statute under which he was being prosecuted and moved to enjoin the prosecution. 401 U.S. at 38–39. The Supreme Court held that principles of equity and comity prohibited federal judicial interference with an ongoing state-court prosecution. *Id.* at 43–44, 53–54. On equity, the Court adhered to "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44. On comity, "an even more vital consideration," the Court emphasized "proper respect for state functions" and avoiding interference "with the legitimate activities of the States." *Id.* at 44.

Our remand is to allow the district court to consider the applicability of what we have identified here as *Younger* abstention. Potentially relevant is whether subsequent Supreme Court opinions have expanded the *Younger* doctrine and are doctrinally distinct in some respects. Among the subsequent key decisions is one that applied abstention to future criminal prosecutions.

*See O'Shea*, 414 U.S. 488. This court later held that the concerns for comity discussed in *O'Shea* "defeat the claims based on the imposition of excessive bail." *Tarter*, 646 F.2d at 1013. A year after *O'Shea*, the Supreme Court did not abstain in a case brought by pre-trial detainees to require a judicial determination of probable cause for their detention. *Gerstein v. Pugh*, 420 U.S. 103, 108 n.9 (1975). Much more recently, the Court has made general pronouncements about *Younger* abstention. *See Sprint*, 571 U.S. at 78. Other authorities will be valuable as well.

After the remand, the *en banc* court will take a fresh look at *Younger*, at which time we will have authority to re-evaluate our own precedent. The issue received little attention in the case by the district court or by counsel. We have already held, on the unusual facts of this court's rejection of abstention in the related Harris County case just as this Dallas County case was getting underway, that the issue is not waived. Yet, like the Supreme Court, we are "a court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). Though we have considered some foundational issues that the district court pretermitted, we conclude that the abstention issue is one which will particularly benefit from a first view in district court.

The only judges left as potentially proper parties are the Magistrate Judges. We also have not yet made a ruling about the inclusion of the Sheriff as a defendant. Our limited remand will give the district court the opportunity, through such proceedings as it directs, to have abstention fully explored, both factually and legally. The *ODonnell* court's *Younger* analysis is not binding on this remand. When the case returns, none of our precedent will be binding on us. Thus, in light of the district court's consideration of the issue after the *en banc* court has received the case, we give the district court authority on remand to reach the result it considers appropriate even if it is inconsistent with any of this court's precedent. What we have actually held in this opinion to be the law, though, must be applied as precedent.

No. 18-11368

\*    \*    \*

We VACATE the preliminary injunction.  We REMAND to the district court for the limited purpose of conducting such proceedings as it considers appropriate and making detailed findings and conclusions concerning abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and related caselaw, and on the effect of Senate Bill 6 on the issues in this case. Once the district court has entered findings and conclusions on those issues, the case will return to this court.  No other issues in this case are part of the remand.  We retain jurisdiction over both the appeal and the cross-appeal during the remand to district court.  Further instructions will be given to the parties after the district court has concluded its work.

No. 18-11368

Stephen A. Higginson, *Circuit Judge*, with whom Dennis and Willett, *Circuit Judges*, join, concurring only in judgment to remand:

Permitting the district court to address *Younger* abstention in the first instance[1] is warranted because, when *Younger*'s three conditions[2] are met, absent extraordinary circumstances, a district court is required to abstain. *Hicks v. Miranda*, 422 U.S. 332, 350 (1975).

This court previously addressed a similar but distinct challenge to bail proceedings in Harris County. *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018) (*ODonnell I*). In concluding that *Younger* did *not* bar federal court review in the Harris County case, our court held *only* that *Younger*'s third prong—whether the plaintiff has an "adequate opportunity in the state proceedings to raise constitutional challenges," *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982))—had not been met. *ODonnell I*, 892 F.3d 147. Even that holding was tentative because our court explicitly chose not to reach whether pretrial habeas in Texas provides such opportunity. *ODonnell I*, 892 F.3d at 156-157 & n.3. *But cf. Ex Parte Keller*, 595 S.W.2d 531, 532–33 (Tex. Crim. App. 1980); *Ex parte Anderson*, No. 01-20-00572-CR, 2021 WL 499080 (Tex. App. Feb. 11, 2021).

---

[1] *See Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1272–73 (10th Cir. 2002); *see also Dandar v. Church of Scientology Flag Serv. Org., Inc.*, 551 F. Appx. 965, 966–67 (11th Cir. 2013) (per curiam).

[2] Under abstention doctrine, as instructed in *Younger v. Harris* to "restrain[] courts of equity from interfering with [state] criminal prosecutions." 401 U.S. 37, 44 (1971). Federal courts generally decline to exercise jurisdiction when three criteria are met: "(1) the federal proceeding would interfere with an 'ongoing state judicial proceeding'; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has 'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

No. 18-11368

Significantly, the parties in the instant case dispute whether the plaintiffs could have challenged, or in fact did challenge, the bail deficiencies they allege here. Oral Argument at 2:41—6:26 (plaintiffs' argument), *Daves v. Dallas Cnty., Texas*, No. 18-11368 (5th Cir. 2021);[3] *id.* at 50:56—59:26 (Texas's argument) (Texas' counsel: "There surely was an adequate, effective way to raise these kinds of questions in state court."); *id.* at 1:08:05—1:12:05 and 1:13:30—1:17:36 (plaintiffs' rebuttal); *id.* at 1:15:14—1:15:22 (Plaintiffs' counsel: "I submit, if you're considering making a ruling about adequacy of opportunity, you remand to the district court, so that the district court can make these findings.").

Because *ODonnell I* did not resolve *Younger*'s prong three analysis, we would leave for the district court to determine whether and to what extent plaintiffs have an adequate opportunity to challenge the bail proceedings at issue here. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) ("[T]he burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims'" (quoting *Moore v. Sims*, 442 U.S. 415, 432 (1979))) (alteration in original); *see also Wallace v. Kern*, 520 F.2d 400, 407-408 & nn. 14—16 (2nd Cir. 1975).

In turn, the district court then would have opportunity to apply, also for the first time, fact-specific *Younger* prong *one* caselaw. That is particularly important here since Texas has revised its criminal procedure code specifically as to bail procedure, timely bail hearings, and assessment of arrestees' financial circumstances. *See* Damon Allen Act, 2021 Tex. Sess. Law Serv. 2nd Called Sess. Ch. 11 (S.B. 6). In the bail context, Supreme Court caselaw delineates that federal courts *should* abstain where granting

---

[3] *Available at* https://www.ca5.uscourts.gov/OralArgRecordings/18/18-11368_5-26-2021.mp3.

equitable relief requires an "ongoing federal audit of state criminal proceedings" or "when the normal course of criminal proceedings in the state courts would otherwise be disrupted," *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974); *see also Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. Unit A 1981) ("An injunction against excessive bail, no matter how carefully limited, would require a federal court to reevaluate de novo each challenged bail decision."); *Gardner v. Luckey*, 500 F.2d 712, 715 (5th Cir. 1974) (same). However, federal courts need *not* abstain where such relief merely contemplates procedural safeguards that are not "directed at the state prosecutions as such" and "could not be raised in defense of the criminal prosecution," *Gerstein v. Pugh,* 420 U.S. 103, 108 n.9 (1975); *see also Tarter*, 646 F.2d at 1013 ("The *O'Shea* rubric does not apply, however, to the refusal to docket and hear pro se motions. . . . [A]n injunction requiring that all pro se motions be docketed and considered by the court . . . would add a simple, nondiscretionary procedural safeguard to the criminal justice system.").[4]

In summary, this case vitally implicates state criminal bail proceedings and the constitutional rights of pretrial detainees, yet everyone agrees there has been no analysis of circumstances which may be determinative of *Younger* abstention. Obtaining threshold *Younger* analysis from a district court in the first instance is more than prudent inquiry into Supreme Court abstention doctrine. Getting that analysis, threshold to reaching other difficult and outcome-determinative issues, is crucial to proper adjudication of those same issues, above all to avoid foreclosing avenues for vindicating the

---

[4] Consistently, our sister circuits have reached legally reconcilable, but necessarily fact-developed, conclusions as to whether federal court intrusion into state bail proceedings is permissible. *See, e.g.*, *Walker v. City of Calhoun*, 901 F.3d 1245, 1255 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1446 (2019); *Arevalo v. Hennessy*, 882 F.3d 763, 765–67 (9th Cir. 2018); *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006); *Wallace v. Kern*, 520 F.3d 400, 404–08 (2d Cir. 1975).

constitutional rights of pretrial detainees.  By contrast, not remanding for threshold, first-time abstention inquiry hardens premature resolution of far-reaching issues the majority and dissent would reach, in this instance contracting constitutional guarantees federal courts should vindicate.

Having clarified that our court's minimal discussion in *ODonnell I* of *Younger* gives no conclusive answer to abstention in this case—either prong one or prong three—we would do no more than remand for further proceedings to address *Younger*, permitting the district court to develop the factual record and determine whether this case should be resolved in federal or state courts.  This judicial restraint—a limited remand for application of *Younger*—is especially compelling in light of Texas's intervening passage of Senate Bill 6, revisiting the very bail procedures and guarantees challenged in this litigation, *see Gerstein,* 420 U.S. at 109 (intervening amendments to pretrial procedures warranted remand before resolution), as well as because the Supreme Court, since our Court's en banc argument, has highlighted the difficult matter of federal courts enjoining state judges.  *See Whole Women's Health v. Jackson*, 595 U.S. ___ (2021) (No. 21-463).

Although we offer no view on whether abstention or dismissal of the action is appropriate at this juncture, should the district court decide that it is, it would enter an appropriate order. Similarly, if the district court were to resolve *Younger* in favor of federal court adjudication, it would be within the scope of this limited remand to entertain any appropriate motion, notably related to SB6, which would warrant revisiting the scope and basis for injunctive relief.

No. 18-11368

HAYNES, *Circuit Judge*, joined by STEWART, GRAVES, and COSTA *Circuit Judges*, dissenting:

Lost in the shuffle of the majority opinion is this case's bottom-line issue: in many circumstances, only those with money can get out of jail before trial. So, if you can pay for your crime of arrest, you're free. If you can't, you're not. That is the core of the problem presented here.[1]

Plaintiffs—a class of arrestees who can't pay—claim the bail system violates their due process and equal protection rights. Their arguments are supported by guarantees of individually determined bail enshrined in the Texas Constitution and by landmark Supreme Court opinions putting beyond all doubt that wealth-based detention is unconstitutional. But the majority opinion reframes the merits as jurisdictional issues and goes on to dismiss them. Then, without any party asking the en banc court to do so, the majority opinion remands on the question of abstention.

The majority opinion errs in its treatment of these issues and reaches holdings inconsistent with binding decisions from the Supreme Court, with undisputed fact-finding from the district court, and with basic logic. In the process, it overrules our precedents—precedents designed to protect people from being locked up just because they're poor. I respectfully dissent.

---

[1] As noted by the majority opinion, after the oral argument before the en banc court, the Texas Legislature passed a bill, signed into law by the Governor, which has commonly been called Senate Bill 6. *See* Act of August 31, 2021, 87th Tex. Leg. 2d C.S., S.B. 6. At the request of our court, the parties filed letter briefing about the statute, which goes into effect, for the most part, in January 2022. The parties do not agree on its interplay with the issues here, so I agree with the majority opinion that any impact of this bill on this case should, in the first instance, be assessed by the district court.

## I.    Background

### A.    *ODonnell*

To understand the situation presented in this case, we need to look at how we got here.  Although this case is captioned as *Daves*, the majority opinion uses it to overrule much of the *ODonnell* cases, a series of decisions in which we addressed the constitutionality of Harris County's bail system and found it lacking.

In *ODonnell I*, we concluded that indigent misdemeanor arrestees are denied procedural due process and equal protection of the laws by automatic application of bond schedules without an individualized consideration of their ability to pay.  *ODonnell v. Harris Cnty.*, 892 F.3d 147, 157, 161, 163 (5th Cir. 2018) ("*ODonnell I*").

We first concluded:

- that there was no need to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), because the pending criminal proceedings did not provide an adequate opportunity for arrestees to raise their constitutional claims, *ODonnell I*, 892 F.3d at 156–57;

- that the County Judges were acting as county policymakers in promulgating the bond schedule such that they and the county for which they worked could be sued under 42 U.S.C. § 1983, *see id.* at 155–56; and

- that the county sheriff could not create county liability under § 1983 because the sheriff did not set policy (the sheriff was simply "legally obliged" to follow the judges' orders and warrants), *id.* at 156.

We then addressed the merits of the procedural due process and equal protection claims.  As to procedural due process, we concluded that the plaintiffs had a state-created liberty interest in bail upon sufficient sureties—that is, in having bail considered in relation to a number of factors, ability to

pay being only one. *See id.* at 157–58 (citing TEX. CONST. art. 1, § 11 ("All prisoners shall be bailable by sufficient sureties.")). We reasoned that, because the bond schedules were imposed "almost automatically" *without* consideration of other factors, the county's procedures violated the plaintiffs' due process rights. *Id.* at 158–61.

We reached a similar conclusion on the equal protection issue. We determined that the district court did not err in applying intermediate scrutiny, *id.* at 161–62 (citing *Tate v. Short*, 401 U.S. 395, 397–99 (1971), and *Williams v. Illinois*, 399 U.S. 235, 241–42 (1970)), and that, although counties have a compelling interest in setting conditions under which arrestees will show up for court dates, the procedures then in effect in Harris County were not narrowly tailored to achieve that interest, *id.* at 162. The bottom-line, we reasoned, was that a system that treats two otherwise identical arrestees differently "simply because [one] has less money" (as mechanical application of the bond schedule did) violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 163.

Consequently, we held, procedural reforms were necessary to ensure that arrestees have a hearing shortly after arrest to determine their financial status and to offer them an opportunity for non-cash bail, as the district court in that case had similarly concluded. *Id.* at 164–66. To help ensure that arrestees' rights were protected, we provided a model injunction that would require the defendants to abandon their automatic application of the bond schedule and to conduct an individualized review of each arrestee's ability to pay before setting a bail amount. *Id.*

*ODonnell* came back to our court two more times to address implementation questions concerning that model injunction. In *ODonnell II*, we clarified that *ODonnell I* did not allow for automatic release of indigent arrestees that were unable to post cash bail, and we stayed the district court's

injunction to the extent it did so. *ODonnell v. Goodhart*, 900 F.3d 220, 225–26, 228 (5th Cir. 2018) ("*ODonnell II*"). In *ODonnell III*, we declined to vacate that stay following the voluntary dismissal of the appeal.[2] *ODonnell v. Salgado*, 913 F.3d 479, 482 (5th Cir. 2019) (per curiam) ("*ODonnell III*"). But *ODonnell I*'s key holdings remained—automatic application of the bond schedule was unconstitutional, and plaintiffs were well within their rights to sue the judges who wrote the schedule to stop it.

## B.    Dallas County's Bail System

Dallas County's bail system is much like Harris County's. Per the district court's exhaustive (and unchallenged) fact-finding, the post-arrest system in Dallas County chiefly involves four entities:

- Criminal District Court Judges (the "District Judges");
- Dallas County Criminal Court at Law Judges (the "County Judges");
- Magistrate Judges; and
- the Dallas County Sheriff.

The Magistrate Judges routinely follow policies set by both the District Judges (who can fire the Magistrate Judges) and the County Judges (who cannot). *See* Tex. Gov't Code Ann. §§ 54.301, 305 (appointment and termination authority).

The Magistrate Judges are responsible for determining the conditions of release for arrestees in Dallas County, including the setting of bail. In

---

[2] The original defendants–appellants in *ODonnell* were voted out of office in 2018, and the newly elected judges moved to voluntarily dismiss the appeal. The new Harris County judges have since entered into a consent decree that contains materially similar requirements to the model injunction we provided in *ODonnell I*, among other provisions. *See* Consent Decree, *ODonnell v. Harris Cnty.*, No. 4:16-CV-1414 (S.D. Tex. Nov. 21, 2019) (Dkt. No. 708). That consent decree is obviously not at issue here.

exercising that responsibility, however, the Magistrate Judges rigidly follow preset secured bond schedules promulgated by the District Judges and the County Judges; in effect, the Magistrate Judges treat those schedules as binding. Per the district court, those schedules work "like a menu," with specified "prices" for release associated with "different types of crimes." The Magistrate Judges' bail determinations are, in turn, enforced by the Sheriff, who transports arrestees to and from the county jail and the judges' courtrooms. *Daves v. Dallas Cnty.*, 341 F. Supp. 3d 688, 692 (N.D. Tex. 2018).

Prior to February 2018, the Magistrate Judges did not consider an arrestee's ability to actually pay the applicable price on the menu at all when setting bail. In February 2018 (after this lawsuit was filed), the Magistrate Judges were instructed to start considering financial affidavits containing information on how much the arrestee could afford to pay. But that direction has not made a difference; the district court found as a question of fact that the Magistrate Judges "still routinely treat the schedules as binding" even if they now also receive affidavits. Moreover, the Magistrate Judges apply the bond schedules at rote arraignment hearings where they merely: (1) call an arrestee by name; (2) tell the arrestee the crime he or she has been charged with; (3) state what price on the bail menu is associated with the arrestee's crime; and (4) ask the arrestee if he or she is an American citizen. That's it—most arraignments last under 30 seconds.

Unsurprisingly, the mechanical application of prescheduled prices affects rich arrestees differently than poor arrestees. Arrestees who can pay the scheduled bail amount can do so and be released. But those who cannot are kept confined until their first appearance before a judge—generally four to ten days after arrest for misdemeanor arrestees and several weeks or months after arrest for felony arrestees. Even at that first appearance, judges do not consider alternative conditions of pretrial release on their own accord;

the arrestee must instead file a written motion and wait another week or more for a hearing to be scheduled on his or her continued detention.  In short, the automatic application of the bond schedules keeps poor arrestees in jail—often for weeks or months—simply because they are poor, not because they present a greater risk to the public than rich arrestees.

As a result, poor arrestees are put in the position of having to plead guilty to misdemeanors and low-level felonies simply because doing so lets them walk free on time-served sentences.  For those who do not plead out, however, it is an undisputed fact that they experience a range of other consequences solely because they cannot pay—by virtue of their detention, they face "loss of employment, loss of education, loss of housing and shelter, deprivation of medical treatment, inability to care for children and dependents, and exposure to violent conditions and infectious diseases in overcrowded jails."  Those who can pay can avoid most (if not all) of those consequences.

## C.    This Lawsuit

Turning to this lawsuit, Plaintiffs filed suit challenging Dallas County's bail system in January 2018 accompanied by motions for class certification and for a preliminary injunction.  The district court conducted a hearing on the preliminary injunction motion, where it received live testimony from Defendants and various expert witnesses, reviewed video recordings of bail hearings, and considered thousands of pages of submitted declarations, academic studies, and records.  Following the hearing, the district court certified Plaintiffs as a class, which the district court defined as "[a]ll arrestees who are or will be detained in Dallas County custody because they are unable to pay a secured financial condition of release."

The district court then issued a preliminary injunction, concluding that Plaintiffs were likely to succeed on their procedural due process and

equal protection claims (but not on their substantive due process claim) because they were being detained solely on the basis of their indigency; that is, they could not pay the bail set by the mechanically applied bond schedules. *See ODonnell I*, 892 F.3d at 164–66 (outlining a materially similar model injunction). To redress those issues, the district court's injunction required various procedural reforms to the Dallas County bail system, including: that the judges not impose prescheduled bail amounts without considering individual arrestees' ability to pay; that the judges consider the arrestees' ability to pay within 48 hours of arrest; that the District Judges and County Judges review bail decisions by the Magistrate Judges; and that the Sheriff not enforce detention orders made in violation of these conditions. The district court did not order that anyone conduct (or review) any substantive necessity findings prior to detention, nor that any pending or future state court prosecutions be stopped or altered on the merits. The case is now up on interlocutory appeal of the district court's injunction.

## II. Discussion

Having just reviewed the undisputed facts of this case, two features of this litigation are obvious.

The first: nothing about the district court's injunction prevents the State from prosecuting Plaintiffs in any way. It merely orders a meaningful consideration of ability to pay as part of the pretrial detention process, something that Plaintiffs pointedly do not receive from the judges in Dallas County. Plaintiffs can still be charged, tried, convicted, and sentenced as before; all that the district court has ordered is that an arrestee's lack of assets not be the determining factor in whether they sit in jail throughout that process. Nothing affects the prosecutor's bottom line.

The second: the County Judges and the District Judges set the price that Plaintiffs must pay to gain release, making the Magistrate Judges feel

compelled to charge that price in virtually every case—which the Sheriff must then enforce by keeping Plaintiffs in jail. All four actors work in tandem, the effect of which is the detainment of arrestees based solely on their wealth.

The majority opinion ignores these obvious features in its conclusions on municipal liability, state sovereign immunity, standing, and abstention—decisions that divest a number of parties from the case. But wrongly so. All Defendants in this case can—and should—be included in the injunction. The County Judges and the District Judges set policies that are, in practice, the alpha and the omega of bail decisions in Dallas County—and the Sheriff is the backstop that keeps Plaintiffs in jail under those policies. They are all, therefore, proper parties in a case seeking to stop the routine practice of keeping poor arrestees in jail simply because they are poor.

## A.    Municipal Liability and State Sovereign Immunity

### 1.    County Judges

The majority opinion concludes that the County Judges can assert state sovereign immunity. But they cannot. The County Judges are plainly county officials, incapable of asserting state sovereign immunity. Moreover, their conduct in promulgating the misdemeanor bond schedule is policymaking of the sort that can make Dallas County itself also liable.

#### i.    County Officials

We must first determine whether the County Judges are county officials. The majority opinion concedes that sometimes they are county officials but puts them in the state-official bucket for this case. Interestingly, the County Judges' co-defendants—the District Judges—just come out and say it (with emphasis, no less): "The eleven [County] Judges . . . are elected

*county* officials." I agree. They are county officials for both sovereign immunity purposes and for county liability purposes.

I recognize, of course, that state sovereign immunity under the Eleventh Amendment presents a different issue than county liability under § 1983—the first concerns whether an individual is an arm of the state generally for constitutional purposes, while the second concerns whether an individual is a local policymaker "in a particular area, or on a particular issue" for statutory purposes. *See McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 (1997).

But the two matters are undeniably intertwined. Consider *McMillian*. "While *McMillan* arose in the context of whether a sheriff's decisions establish local policy for purposes of § 1983 and the Court did not discuss the Eleventh Amendment, the *obvious* implication is that the Eleventh Amendment applies once the sheriff is deemed a state officer." ERWIN CHEMERINSKY, FEDERAL JURISDICTION 457 (7th ed. 2016) (emphasis added). Just as § 1983 decisions may invariably implicate the Eleventh Amendment, the inverse is also true—decisions regarding the Eleventh Amendment may invariably implicate § 1983. After all, both the Eleventh Amendment and § 1983 concern the categorization of individuals as state or local parties, and both require an assessment of state law in making that categorization.

Yet, the majority opinion concludes that our decision in *Hudson v. City of New Orleans*, 174 F.3d 677 (5th Cir. 1999), which set various factors for determining how to delineate state and local officials, has no bearing on this case because it arose in the context of the Eleventh Amendment. Majority Op. at 11–14 & n.5. In so concluding, the majority opinion misconstrues a statement from a footnote in *Hudson*—"While we look at the function of the officer being sued in the latter context, we do not in our Eleventh

Amendment analysis." 174 F.3d at 682 n.1. This, of course, does not mean that the Eleventh Amendment analysis has no bearing on § 1983. Rather, because state official designation under the Eleventh Amendment confers immunity for all purposes, whereas the state official designation under § 1983 confers immunity for only *some* purposes (like for the county sheriffs acting in their law enforcement capacity in *McMillian*), function only matters for § 1983. *Hudson* says nothing different and is certainly applicable to this case.

Our own court has previously considered these same arm-of-the-state factors for § 1983 county liability purposes. *See Flores v. Cameron Cnty.*, 92 F.3d 258, 264–69 (5th Cir. 1996). Yet, according to the majority opinion, *Flores* was superseded by *McMillian*, which was decided a year after *Flores* and made "clear . . . that reliance on those factors can be misleading" when deciding for whom an official is acting. Majority Op. at 12. Never mind that at least one of our sister courts recently considered these factors for § 1983 county liability purposes, *see Couser v. Gay*, 959 F.3d 1018, 1023, 1025–31 (10th Cir. 2020), and that *McMillian* did no such thing. Here's what *McMillian* says on considering how state law defines an actor (i.e., the first *Hudson* factor):

> This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.

*McMillian*, 520 U.S. at 786. This certainly doesn't suggest that "the *Hudson* factors are not controlling on our issue." Majority Op. at 11 n.5. Instead, *McMillian* is entirely consistent with *Hudson*—the *Hudson* analysis does not

stop at how state law treats the official but considers three other factors along the way.[3]

So, let's consider the *Hudson* factors: (1) whether state law treats the official as primarily local or as an arm of the state; (2) whether the official is paid from the local governmental unit; (3) whether the official has local autonomy—including whether it can hold property and sue and be sued in its own name;[4] and (4) whether the official is primarily concerned with local affairs. 174 F.3d at 681. Of those factors, it is "well established" that the second (source of funding) is "the most important." *Id.* at 682.

That funding question weighs heavily in favor of the County Judges being county officials here: unlike the District Judges (who are paid by the state), the County Judges are paid by the county. Tex. Gov't Code Ann. § 25.0593(c); *cf. id.* § 659.012(a)(1). The money also flows in the other direction, too; the fees they collect go straight into the county coffers. *Id.* § 25.0008. That squarely puts them on the county official side of the line. *Hudson*, 174 F.3d at 682.

All the other factors also weigh in favor of them being county officials. Beyond the pay and fine aspects, state law treats the County Judges as local

---

[3] Of course, the en banc court is free to revise our previous decisions, but nothing in *McMillian* requires the court to do so. Nor would doing so be consistent with the intertwined nature of analyzing state sovereign immunity under the Eleventh Amendment and county liability under § 1983.

[4] We have sometimes described the ability to hold property and the ability to sue as separate factors, but those considerations more often than not crop up as manifestations of local autonomy. 13 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3524.2 (3d ed. 2018 & Update 2021) (acknowledging that courts sometimes discuss capacity to hold property and to sue as additional factors but noting that the "central factor[]" common to those considerations is "the degree of autonomy"). We have all but acknowledged as much by noting that they are typically analyzed "in a fairly brief fashion." *Hudson*, 174 F.3d at 681.

officials in a number of other ways. Unlike District Judges whose inter-term vacancies are filled by the Governor of Texas, vacancies of County Judges are filled by the County Commissioners Court.[5]   *Id.* § 25.0009; *cf.* TEX. CONST. art. 5, § 28(a). Indeed, *Peden* (cited in the majority opinion), which held that the Governor's appointment was without authority, makes clear that this difference is "because of the distinct separation of county judges from judges of our other courts, state and district." *State ex rel. Peden v. Valentine*, 198 S.W. 1006, 1009 (Tex. App.—Fort Worth 1917, writ ref'd) (addressing a Tarrant County civil county court). The County Judges' statutorily close ties to the county do not end there; to take just a handful of examples, the County Commissioners Court can increase their salary, is in charge of providing their facilities and personnel, and can give them longer terms on the bench. *See* Tex. Gov't Code Ann. §§ 25.0005, .0010, .0016. If all that were not enough, Texas courts themselves also recognize that statutory county judges (like the County Judges here) are generally county officers. *See Peden*, 198 S.W. at 1008 (concluding that a statutory county judge is "a county officer as contradistinguished from a district judge or a state officer"); *see also Jordan v. Crudgington*, 231 S.W.2d 641, 646 (Tex. 1950) (concluding that judges of a court created for a single county—like the County Judges here—are county officers). In short, state law definitively treats the County Judges as county-level officials.

The County Judges likewise have significant local autonomy in Dallas County. One need look no further than the facts of this case to reach that conclusion: exercising their local rulemaking powers under Texas

---

[5] As is true in many states, judges in Texas are generally elected. But when a vacancy occurs during a judge's term, it has to be filled until the next election. The Governor does that for the District Judges; the Dallas County Commissioners Court does that for the County Judges.

No. 18-11368

Government Code § 74.093, the County Judges created a bond schedule that is, in practice, the final say on how much misdemeanor arrestees must pay to make bail in Dallas County.

The County Judges' primary area of concern is also local: their jurisdiction covers all misdemeanor offenses, but only within Dallas County. Tex. Gov't Code Ann. §§ 25.0593, 26.045. Obviously, state entities have to draw lines somewhere. But when those lines mirror county lines exactly,[6] one has to conclude that county-level affairs are the primary target.

The majority opinion focuses on Article V, section 1 of the Texas Constitution as providing that county courts are "established by the constitution," which somehow makes them state actors. Of course, this citation overlooks the fact that the exact same paragraph also mentions Commissioners Courts, which are the Texas equivalent of a city council over the county. It is difficult to envision how anyone could term the Dallas County Commissioners as "state actors" when they run Dallas county. *Wichita Cnty. v. Bonnin*, 182 S.W.3d 415, 419 (Tex. App.—Fort Worth 2005, pet. denied) ("The Texas Constitution provides that the commissioners court 'shall exercise such powers and jurisdiction over all county business . . . .'" (quoting Tex. Const. art. V, § 18)). The same could be

---

[6] There are a few statutory county judges who serve more than one county due to size, but the vast bulk are "county by county," and that is the limit of their authority. In any event, it does not matter that some *other* Texas judges serve multiple counties. The suggestion that the responsibilities of other judges inform whether *these* judges acted as county policymakers is at odds with *McMillian*'s admonition that the general responsibilities of a job are largely irrelevant to the policymaker inquiry. *See* 520 U.S. at 785. It is also irrelevant to the County Judges themselves, who serve only Dallas County—making it not at all strange to call them county policymakers insofar as they determine the amount of bail arrestees must pay in this county. Moreover, even if they served more than one county, there is no reason to think that a multi-county judge could not be a policymaker in whatever county or counties in which the judge sets a generally applicable bond schedule (or, for that matter, any other policy).

No. 18-11368

questioned about "justices of the peace" who are also mentioned in that same paragraph. Indeed, the Texas Constitution separates the discussion of county courts and county judges from district court and district judges.

Given that all these factors point in one direction, the answer is obvious: the County Judges are county officials.[7] They cannot assert state sovereign immunity and, as discussed below, can be appropriate officials for attaching municipal liability. *See Hudson*, 174 F.3d at 683.

### ii.    County Policymakers

The next question is just as important, at least insofar as its answer determines whether Dallas County itself should remain in the case: are the County Judges acting as county *policymakers* with respect to the bond schedule such that county liability can attach? Yes, they are.

---

[7] The conclusion that parts of a state judicial system might include county-level officials is not revolutionary. We have, for instance, previously concluded that certain county-focused judicial structures cannot assert state sovereign immunity. *Skelton v. Camp*, 234 F.3d 292, 296–97 (5th Cir. 2000). So have other circuits. *See Chisolm v. McManimon*, 275 F.3d 315, 323–24 (3d Cir. 2001) (concluding that a set of county-level judges were not arms of the state); *Hyland v. Wonder*, 117 F.3d 405, 413–14 (9th Cir. 1997) (same); *see also Alkire v. Irving*, 330 F.3d 802, 812–13 (6th Cir. 2003) (indicating that a county court could not assert state sovereign immunity if its funding came from the county). Likewise, we and other circuits have also concluded that related entities intimately connected to courts cannot assert state sovereign immunity, including when the claims at hand arise in a carceral context. *See Flores*, 92 F.3d at 264–69 (holding that a juvenile probation board was a county agency for the purposes of county liability); *Crane v. Texas*, 766 F.2d 193, 194–95 (5th Cir. 1985) (per curiam) (holding that a Texas sheriff was a county official); *Carter v. City of Philadelphia*, 181 F.3d 339, 347–55 (3d Cir. 1999) (holding that a DA's office was not an arm of the state for the purposes of claims arising from administrative and policymaking functions); *Kitchen v. Upshaw*, 286 F.3d 179, 184–85 (4th Cir. 2002) (holding that the Virginia Regional Jail Authority was a county agency for the purposes of a due process claim); *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 566–67 (9th Cir. 2001) (holding that the Los Angeles Sheriff's Department was not an arm of the state for the purposes of municipal liability).
There is, in other words, no "courts exception" to the arm of the state analysis.

No. 18-11368

As a preliminary point, the question of whether they are acting for the county here is resolved by the conclusion that they are county officials, but our analysis goes deeper. *Cf. Flores v. Cameron Cnty.*, 92 F.3d 258, 264–69 (5th Cir. 1996) (analyzing the county official state sovereign immunity factors in assessing whether an entity acted for the county for § 1983 county liability purposes). The majority opinion argues that we must determine whether the County Judges act for the county *in this particular context*, as local officials can sometimes act on behalf of the state if they are following some state law duty. *See McMillian v. Monroe Cnty.*, 520 U.S. 781, 784–85 (1997); *see, e.g.*, *Esteves v. Brock*, 106 F.3d 674, 677–78 (5th Cir. 1997).

The majority opinion then suggests that the County Judges are acting on behalf of the state. However, its apparent conclusion on that point rests on a flawed assumption about the nature of the challenged conduct: that the County Judges are merely setting bail per state law. *See* Tex. Code Crim. P. arts. 15.17, 17.15, 17.031(a). But that's not what the County Judges are doing—they're issuing generally applicable bond *schedules*, not holding bail hearings. Look high and low in the statutes cited by the majority opinion, there is no state directive on that.

So where does the County Judges' ability to issue bond schedules come from? They tell us that they're promulgating a local rule about how much bail all misdemeanor arrestees have to pay in their jurisdiction. *See* Tex. Gov't Code Ann. § 74.093 (allowing them to promulgate local rules). But that is not a state-imposed duty; Texas law *lets* them issue local rules, it does not *require* them to do so—and it certainly does not require them to issue local rules that set the bail applicable to every misdemeanor case that comes in the door.[8] Tex. Gov't Code Ann. § 74.093. So, when they promulgate

---

[8] I do not comment on whether a bond schedule is in fact a permissible local rule as a matter of state law. Nor do I comment on whether local rules generally constitute county policies.

local rules regarding bail for misdemeanor arrestees, they act on their own initiative. Since they are county officials while doing so, they cannot be reasonably described as acting on behalf of the state.

So, they are county officials acting on behalf of the county—but are they also engaged in *policymaking*? Yes. To be sure, most of the time and in most contexts, they are not; their primary job is to decide cases and controversies, a classic judicial function. *See Johnson v. Moore*, 958 F.2d 92, 93–94 (5th Cir. 1992); *see also, e.g.*, *Adams v. Governor of Del.*, 922 F.3d 166, 178–79 (3d Cir. 2019), *rev'd on other grounds and vacated sub nom. Carney v. Adams*, 141 S. Ct. 493 (2020). But the question here is conduct-specific. The operative inquiry focuses on whether, as a practical matter, the judges act as policymakers *in this particular context*—not whether the judges act as policymakers for Dallas County "in some categorical, 'all or nothing' manner." *McMillian*, 520 U.S. at 785. The question is simply whether they set policy "in a particular area, or on a particular issue." *Id.* Thus, we need not "make a characterization . . . that will hold true for every type of official action the [judges] engage in"—we must simply determine whether the County Judges are county policymakers with respect to the specific conduct at issue in this case. *Id.*

With that framing, the specific conduct at issue here—setting a bond schedule for *others* to apply and then acquiescing in its rigid application—is policy-setting conduct that is not undertaken in the County Judges' judicial capacity. Judges typically act beyond their judicial capacities (and thereby can both act as policymakers *and* be directly enjoined under § 1983) whenever their conduct is untethered from any particular "controversy

---

I merely conclude that the County Judges have created county policy by purporting to issue a local rule that governs the bail set by other judges.

which must be adjudicated." *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 731 (1980) (internal quotation marks and citation omitted); *cf. Davis v. Tarrant Cnty.*, 565 F.3d 214, 227 (5th Cir. 2009) (noting that acts taken in a judicial capacity do not create county liability). Consistent with these principles, in *Davis*, we identified a four-factor test for determining whether conduct is judicial in nature, looking to whether the conduct at issue: (1) is "a normal judicial function"; (2) "occurred in the courtroom or appropriate adjunct spaces"; (3) "centered around a case pending before the court"; and (4) "arose directly out of a visit to the judge[s] in [their] official capacity."[9] 565 F.3d at 222. We have likewise identified that issuing general orders regarding how to process stages of litigation does *not* qualify as a judicial act. *Id.* at 222 & n.3 (citing for that proposition *Morrison v. Lipscomb*, 877 F.2d 463, 465–66 (6th Cir. 1989)).[10]

Balancing the *Davis* factors, the County Judges were not engaged in judicial conduct here because they were merely directing other judges in a manner divorced from any given case. First, it is indisputable that setting bail in a particular case is a normal judicial function in the abstract. *See Garza v. Morales*, 923 S.W.2d 800, 803 (Tex. App.—Corpus Christi, 1996, no writ). But it is not a normal judicial function *for the County Judges* to set generic bail for the Magistrate Judges, who are the ones who generally set conditions of

---

[9] Texas state courts apply essentially the same test. *James v. Underwood*, 438 S.W.3d 704, 710 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (per curiam).

[10] The majority opinion notes that only the first factor is relevant because there are some "factual situations in which it makes sense not to consider multiple factors but just to focus on an overarching point." Majority Op. at 23 (footnote omitted). I disagree. Suggesting that factors can be ignored in some factual situations is an unworkable standard. Of course, as in any test where factors are weighed, some factors may weigh more heavily in a particular situation; but that doesn't mean that some factors should not even be considered. In my view, courts should apply all the factors and then reach a decision, as we have done previously. *See, e.g.*, *Ballard v. Wall*, 413 F.3d 510, 515–16 (5th Cir. 2005).

release in Dallas County's bail system. *See Ex parte Clear*, 573 S.W.2d 224, 229 (Tex. Crim. App. 1978) (en banc) (noting that Magistrate Judges can have "[s]ole jurisdiction" over bail determinations in some circumstances). Second, nothing indicates that the bond schedules were prepared by the County Judges in the Magistrate Judges' chambers or any other "adjunct" spaces to the Magistrate Judges' courtrooms. *Davis*, 565 F.3d at 222. Perhaps most significant are the third and fourth factors: setting a generally applicable bond schedule is definitively not "centered around" any individual case and does not, as a consequence, result "directly out of a visit" to the County Judges in any sort of judicial capacity. *Id.* Considering these factors, the County Judges are not acting in a judicial function in this context; they are setting policy on how others should process cases. *Id.*; *see Consumers Union*, 446 U.S. at 731; *Morrison*, 877 F.2d at 465–66 (concluding that a presiding judge was acting in an administrative capacity when issuing a general moratorium on writs of restitution because doing so was a "general order, not connected to any particular litigation").

That conclusion flows naturally from how the County Judges actually act with respect to the Magistrate Judges. The district court found as a factual matter (which has not been challenged) that the County Judges issue the schedules that the Magistrate Judges "routinely treat . . . as binding."

The majority opinion overlooks that this is a factual finding and makes its own factual finding that the County Judges are somehow removed from the Magistrate Judges' work. That is not what the district court found. That is, the schedules are applied as a matter of course across every applicable case in Dallas County. There is no indication that the bond schedules were issued to resolve any particular matter or, indeed, that they even appear on any specific criminal dockets. Because the Magistrate Judges mechanically

follow their generally applicable bond schedules,[11] they are acting, in practice, as "the final authority" and "ultimate repository of county power" when it comes to the bail amounts misdemeanor arrestees must pay in Dallas County. *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980). That makes them county policymakers.

The County Judges attempt to analogize this case to *Davis* itself. In doing so, they correctly note *Davis*'s conclusion that certain conduct "inextricably linked" to specific cases falls on the judicial side of the judicial–policymaking line. 565 F.3d at 226. But *Davis* does not support their position that *all* "general guidelines for processing criminal cases" are judicial in nature. *Davis* merely concluded that selecting attorneys for an appointed counsel list was a judicial act and, even then, only because those decisions "functionally determine which attorney actually will be appointed in a particular case." *Id.* at 225–26. No such link exists between the bond schedules and individual cases here—there is, for instance, no evidence that the judges issued the schedules because they wanted *specific defendants* to pay a particular bail amount in the same way that the *Davis* judges wanted specific attorneys to appear in their courtrooms. Rather, the bond schedules were generally promulgated policies—policies which, as the majority opinion acknowledges, were set by judges other than the judges that actually executed the policies. *See* Majority Op. at 23 ("[I]n *Davis*, the judges establishing the procedure were also the ones appointing counsel. Here, the bail schedules

---

[11] The majority opinion again engages in its own fact-finding here, taking issue with the district court's findings and issuing its own "reasonable prediction" regarding the treatment of bail schedules. Majority Op. at 29–30. The district court considered the proffered facts and made a different factual finding to which we should defer. Deciding what people are thinking is quintessential district court-level fact-finding not speculation for appellate courts to decide.

were created by judges other than those who would later set bail for individual arrestees.").

The bottom line is that we have county officials, who are paid by the county, creating local rules that only apply to the county in which they sit. They are not acting under a state law duty or in a judicial capacity. They are county policymakers. *See ODonnell I*, 892 F.3d at 155–56. Accordingly, they can be enjoined with respect to their bond schedules, and for the same reasons, Dallas County is liable for their conduct.

### 2.    District Judges

The District Judges are subject to a different analysis, given some differences in state law applicable to them. I agree that they are state officials rather than county policymakers, but they are nonetheless subject to the same ultimate conclusion: they can be prospectively enjoined in this case.

I, therefore, do not disagree with the majority opinion on the point that the District Judges are arms of the state, generally capable of asserting state sovereign immunity. Indeed, our case law suggests the same. *See Davis*, 565 F.3d at 228 (suggesting that state district judges like the District Judges are arms of the state); *Warnock v. Pecos Cnty.*, 88 F.3d 341, 343 (5th Cir. 1996) (same).

However, the fact that they are state officials does not exempt them from this case. That is because state sovereign immunity does not block the sort of injunctive relief sought here; the District Judges can be prospectively enjoined for their violations of federal law under the doctrine laid out in *Ex*

No. 18-11368

*parte Young*, 209 U.S. 123, 157 (1908). *See Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515–16 (5th Cir. 2017).[12]

The requirements are straightforward: for *Ex parte Young* to permit a suit against otherwise immune state officials, a plaintiff must sue them in their official capacities, allege an ongoing violation of federal law, and seek relief that properly can be characterized as prospective. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Any official who has "some connection" to enforcement of the alleged violation of federal law is

---

[12] The Supreme Court recently issued a decision in *Whole Woman's Health v. Jackson*, No. 21-463, 2021 WL 5855551 (U.S. Dec. 10, 2021), which concerned a pre-enforcement challenge to a Texas law (S.B. 8) wherein the plaintiffs sought to enjoin state court judges and their clerks from hearing or docketing cases seeking to enforce S.B. 8. The Court explained that state court judges "normally" may not be enjoined under *Ex parte Young* because they typically "do not enforce state laws as executive officials might." *Id.* at *5. Instead, when "a state court errs in its rulings" in a particular case, "the traditional remedy" is to appeal that decision. *Id.*

*Whole Woman's Health* concerns a wholly different part of *Ex parte Young* and does not alter that analysis, here. In *Whole Woman's Health*, the state court judges had no relation to S.B. 8—they neither created nor enforced it. The bond schedules at issue in this case, however, were promulgated by judges, not the legislature, and they are enforced by judges, not private citizens or executive officials. Moreover, because the promulgation of the bond schedule is unlinked to any particular case (and is enforced by judges that didn't even create it), the "traditional remedy" of an appeal is unavailable and the traditional role of judges is not in play.

This case is more in line with *Shelley v. Kraemer*, 334 U.S. 1 (1948), which recognized that when state courts enforce rules "formulated by those courts" and such rules violate constitutional rights, those courts may be stopped from continued enforcement. *Id.* at 17, 20. The *Whole Woman's Health* Court did not overrule *Shelley v. Kraemer*; it instead explained that that case was different because it did not involve a pre-enforcement action and constitutionality was used as a defense. *Whole Woman's Health*, 2021 WL 5855551, at *7. In other words, S.B. 8 presented a different context because the violators of the law had not yet been sued and had therefore not faced conduct to which they could raise constitutionality as a defense. This case is different. The Plaintiffs here were actually (and unconstitutionally) detained for wealth-based reasons. The unconstitutional practice was promulgated by judges and is enforced by judges. Consistent with *Shelley v. Kraemer*, state court judges may be enjoined for their independently unconstitutional acts. *Whole Woman's Health* presents no issue.

amenable to suit. *Ex parte Young*, 209 U.S. at 157. To have such a connection, we have said that plaintiffs need only demonstrate that, in exercising official duties, the official "constrain[s]" the plaintiffs' rights in some way.[13] *Air Evac*, 851 F.3d at 519; *see also K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). That requirement is plainly satisfied.

Specifically, this case is akin to our court's decision in *Air Evac*, in which we concluded that a set of state officials had constrained a plaintiff's

---

[13] This is getting old to say, but our circuit's case law on what constitutes "some connection" to enforcement for *Ex parte Young* purposes is hardly a paragon of clarity. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) ("This circuit has not spoken with conviction about all relevant details of the 'connection' requirement."), *cert. denied*, 141 S. Ct. 1124 (2021) (mem.); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020) ("The precise scope of the 'some connection' requirement is still unsettled . . . ."); *City of Austin v. Paxton*, 943 F.3d 993, 999 (5th Cir. 2019) ("What constitutes a sufficient 'connection to . . . enforcement' is not clear from our jurisprudence." (quoting *Ex parte Young*, 209 U.S. at 157)), *cert. denied*, 141 S. Ct. 1047 (2021) (mem.).

As a general matter, I am skeptical that our various probing—and jurisdictional—"some connection" tests are consistent with the Supreme Court's articulation of *Ex parte Young* as a "straightforward inquiry" that is satisfied so long as the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md.*, 535 U.S. at 645 (quotation omitted). In particular, our heavy use of redressability related questions in the state sovereign immunity inquiry strikes me as both redundant to our well-established approach to standing and, more to the point, irrelevant to whether the case is in substance a suit against a sovereign entity. *Cf. Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) (noting that the "some connection" test is less demanding than the standing inquiry). It seems to me that the better approach would be to leave much of that analysis to a causation question on the merits—as applicable here, whether the named defendant "subject[ed], or cause[d] to be subjected" the plaintiffs to a violation of their rights under federal law—rather than frontload it all into an attempt to discern whether the state's sovereign interests are impacted by the litigation. 42 U.S.C. § 1983; *see Verizon Md.*, 535 U.S. at 646 (emphasizing that merits analyses are not appropriate in the state sovereign immunity inquiry).

Even so, we need not clarify our "some connection" approach in this case; it is plain that the District Judges have a sufficient connection to the enforcement of their own, binding bond schedule to be amenable to suit under our precedents. *See Air Evac*, 851 F.3d at 515–16.

rights by setting a particular reimbursement rule applicable to the plaintiff that the officials could, in turn, police through a pseudo-appeal process. 851 F.3d at 519. That is, although the officials did not "direct[ly] enforce[]" their rule, they could be prospectively sued simply because they were practically able to "effectively ensure the . . . scheme is enforced from start to finish." *Id.*

The same analysis applies here. The District Judges have used their local rule setting authority, Tex. Gov't Code Ann. § 74.093(c), to issue a bond schedule that in practice controls their subordinates. It is clear from both Plaintiffs' complaint and from the district court's fact-finding that the District Judges effectively ensure that their schedule is applied. The schedule is, per the complaint, the "exclusive means" for determining pretrial release and is, per the district court, "binding" on the Magistrate Judges. Setting a binding schedule that the relevant decisionmakers do not deviate from is enough to constrain the rights of indigent arrestees like Plaintiffs for *Ex parte Young* purposes. That a different group—the Magistrate Judges—directly enforce the bond schedule is not determinative. *Air Evac*, 851 F.3d at 519. Notably, we are not talking about enjoining the District Judges from hearing cases or telling them how to determine a particular case, so those types of situations are not in play here.

If the actual alleged (and proven) facts of this case were not enough, the District Judges' ability to effectively ensure that their bond schedule is applied is also obvious from the control they exercise over the Magistrate Judges under state law. As a general matter, the Magistrate Judges follow the District Judges' lead across the board: the Magistrate Judges are "surrogate court officer[s]" whose role is "to assist the district judge." *Madrid v. State*, 751 S.W.2d 226, 229 (Tex. App.—El Paso 1988, pet. ref'd). The Magistrate Judges' decisions depend on "active or tacit finalization" by the District Judges. *Id.* at 228. Even when explicitly referred a matter, the Magistrate

No. 18-11368

Judges "have no power of their own" and their orders are only "legally binding" if "adopted by the referring court." *Kelley v. State*, 676 S.W.2d 104, 107 (Tex. Crim. App. 1984); *accord Omura v. State*, 730 S.W.2d 766, 767 (Tex. App.—Dallas 1987, writ ref'd) ("[A] magistrate acts only as the agent of the district court, under *proper supervision* by the court."); *see generally* Tex. Gov't Code Ann. § 54.308. Further, although the District Judges are correct that the Texas Court of Criminal Appeals has given more significant discretion to Magistrate Judges on bail issues (at least until another judge assumes jurisdiction over a case), it is plain that, notwithstanding that authority, the Magistrate Judges *here* follow the District Judges' marching orders on the subject.

The District Judges thus have both the power to "effectively ensure" that their bond schedule is enforced and have, as a matter of undisputed fact, actually ensured that the specific prices they have set are enforced. *Air Evac*, 851 F.3d at 519. That makes them proper *Ex parte Young* defendants.

The District Judges try to distance themselves from that conclusion by asserting that they don't control every step the Magistrate Judges take. After all, they note, the schedule is technically called a guideline and, what's more, the Magistrate Judges continue to simply follow the schedule even after the District Judges told them to also evaluate financial affidavits. But those arguments are put firmly to rest by the Plaintiffs' allegations (and, for that matter, the district court's fact-finding): whatever label the District Judges put on the schedule—and even though they have added the affidavits as an additional step in the process—the specific prices on the schedule are plainly binding in practice.

Yet, the majority opinion buys the District Judges' argument, essentially concluding that state officials can duck responsibility simply by calling their *actually binding* policies mere recommendations. The majority

opinion questions "how the District Judges' and County Judges' promulgations of the non-binding bail schedules would predictably cause the Magistrate judges to *treat* the schedules as binding." As if something called a recommendation could never be intended and treated as a requirement. Indeed, the majority opinion flatly disregards Plaintiffs' allegations (not to mention, the district court's fact-finding) that the District Judges' "recommended" schedule was nothing of the sort. *Cf. Verizon Md.*, 535 U.S. at 646 (emphasizing that an allegation of an ongoing violation of federal law is sufficient; no "analysis of the merits of the claim" is necessary). But the majority opinion's conclusion also poses a deeper problem by injecting a perplexing formalism into the equation: per the majority opinion, state officials can now wash their hands of their actual connection to enforcement just by calling their directives advisory—even when plaintiffs allege (and a federal district court finds as a matter of fact) that the directive actually governs how others act. That cannot be the law and, in fact, is not the law. So long as plaintiffs plausibly allege that the state officials "constrain" their rights in the exercise of their official duties, it does not matter what label the officials slap on their stationery. *Air Evac*, 851 F.3d at 519.

All this squares up: whether or not the District Judges can assert state sovereign immunity, they can be prospectively enjoined under *Ex parte Young*. That does not necessarily answer, however, whether the *specific* injunctive relief sought here is appropriate, a subject on which the District Judges launch a bevy of arguments. But, like their general complaints, these also fail. In particular, the District Judges assert that the district court cannot require them to review bail decisions (which they contend would violate state law); change the bond schedule (which they contend is an inappropriate order to affirmatively regulate); or instruct the Magistrate Judges to assess arrestees' ability to pay (which they contend is an improper directive to comply with state law). The District Judges are wrong on all three points.

No. 18-11368

On the first point (reviewing bail decisions), it is true that, under Texas law, bail decisions are sometimes left to the "sole jurisdiction" of the Magistrate Judges—such as when those judges hear the matter in the first instance. *See Ex parte Clear*, 573 S.W.2d at 229. It is likewise true that directing the District Judges to review challenged Magistrate Judge bail decisions (as the district court did) would appear to require them to assume some jurisdiction over the bail process, at least in part. But, as the District Judges elsewhere acknowledge, that's something the District Judges *can already do*; as they put it, they are already empowered to "consider a motion to *reduce* [Plaintiffs'] bail." *See, e.g.*, *Ex parte Williams*, 467 S.W.2d 433, 434 (Tex. Crim. App. 1971). So, directing them to do so here does not require any violation of state law—it merely requires them to exercise authority they already have. Indeed, to the extent there are any lingering *Younger* concerns, that direction is also minimally intrusive; the District Judges' review need not even result in a written decision. The district court's direction is therefore permissible under *Ex parte Young*. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 55–56, 58 (1991).

On the second point (altering the bond schedule), the District Judges make much of the general principle that the federal government lacks the ability to require affirmative state regulation on a topic. But the cases they cite for that proposition are about commandeering state enforcement authorities to create policies in the service of accomplishing some statutory goal, not about federal court involvement in rectifying self-evident constitutional violations. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012); *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 469 (5th Cir. 2020). That distinction dooms the District Judges' argument; contrary to the District Judges' intimations otherwise, injunctions requiring affirmative steps to safeguard constitutional rights fall squarely within the equitable powers of the federal

No. 18-11368

courts.[14]   As this court has previously explained, correcting Fourteenth Amendment violations in particular often requires state officials to change their policies, and so a court is empowered to "exert its equitable power to prevent repetition of the violation . . . by commanding measures that safeguard against recurrence." *Ruiz v. Estelle*, 679 F.2d 1115, 1156 (Former 5th Cir. 1982), *modified on other grounds*, 688 F.2d 266 (Former 5th Cir. 1982). The district court's order is plainly permissible under that framing. Indeed, the order does not even direct any defendant to create any new affirmative policies, it just requires defendants to alter their *existing* policies—including, specifically, an existing bond schedule the District Judges have already issued—to conform them to the requirements of federal law. That is the sort of prospective relief available under *Ex parte Young*. *See Verizon Md.*, 535 U.S. at 645.

---

[14] *See, e.g.*, *M. D. by Stukenberg v Abbott*, 907 F.3d 237, 276–79, 282–83 (5th Cir. 2018) (concluding that a federal court could require a state foster care system to implement training, investigative, reporting, and computer systems policies); *Ruiz v. Estelle*, 679 F.2d 1115, 1155–56 (Former 5th Cir. 1982) (concluding that a federal court could require a state prison system to record all disciplinary hearings, preserve those recordings, and make them available to inmates), *modified on other grounds*, 688 F.2d 266 (Former 5th Cir. 1982); *Ciudadanos Unidos de San Juan v. Hidalgo Cnty. Grand Jury Comm'rs*, 622 F.2d 807, 828–30 (5th Cir. 1980) (concluding that a federal court could require local jury commissioners to formulate policies to ensure that indigent individuals, among other groups, were adequately represented in grand jury pool); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–20 (1971) (requiring a state public school district to implement a busing policy to rectify an equal protection violation and noting that a federal court's power to enter such injunctive relief "does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right"); *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759–60 (5th Cir. 2018) (per curiam) (concluding that a federal court could require a prison to provide an inmate with less sugary meals); *Gates v. Cooke*, 376 F.3d 323, 339–40 (5th Cir. 2004) (concluding that a federal court could require a prison to adopt a policy providing fans, ice water, and daily showers to inmates under certain conditions); *Miller v. Carson*, 563 F.2d 741, 751 (5th Cir. 1977) (concluding that a federal court could require a prison to adopt a policy allowing inmates to exercise outdoors).

No. 18-11368

Same with the third point (directing the Magistrate Judges to consider ability to pay). The District Judges assert that such relief is inappropriate because state law already requires the Magistrate Judges to take into consideration an arrestee's ability to make bail. *See* Tex. Code Crim. P. art. 17.15(4). It is true that federal courts cannot prospectively enjoin state officials to comply with state law under *Ex parte Young. See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). But that's not what Plaintiffs are asking for; they want the District Judges to direct the Magistrate Judges to consider their ability to pay because *the Fourteenth Amendment* requires it. That the same relief could also be available under state law is immaterial. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004); *see also Tex. Democratic Party*, 961 F.3d at 401 (emphasizing that an attempt to prevent conduct that "violate[s] the Constitution" is not an attempt to enforce state law).

In short, even if the District Judges are state officials, they can be prospectively enjoined under *Ex parte Young* in connection with their promulgation of the bond schedule and their acquiescence to its mechanical application on the part of the Magistrate Judges.[15]

## B.    Standing

Plaintiffs have satisfied the concrete injury, traceability, and redressability requirements to establish standing against all Defendants. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The analysis is simple. Plaintiffs as a class are continuously injured by being detained solely based on their inability to pay. So, the concrete injury requirement is met. *McLaughlin*, 500 U.S. at 50–51. It is an unchallenged

---

[15] Because the majority opinion reaches no conclusion on the Sheriff, *see* Majority Op. at 27, I will not address her "classification" here either.

fact that the bond schedules the County Judges and District Judges issue—which the Magistrate Judges and the Sheriff in turn enforce—are the but-for reason that Plaintiffs receive that treatment. So, traceability is met. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Enjoining the Defendants to change how the schedules are enforced would stop this systemic injury. So, redressability is met. *McLaughlin*, 500 U.S. at 51.

Importantly, the County Judges' and District Judges' schedules are not just given "virtually determinative effect"—they are given *actually* determinative effect by the Sheriff and the Magistrate Judges. *Bennett v. Spear*, 520 U.S. 154, 170 (1997). Plaintiffs therefore have standing against all of them.

## C.    Abstention

We've arrived at the final issue—*Younger* abstention—which the majority opinion relies upon heavily even though no party had briefed it to the en banc court.[16] That simple fact should end the discussion: a party abandons an argument by failing to present it in en banc briefing, regardless of whether the party had previously raised it at some other stage of litigation. *Coke v. Gen. Adjustment Bureau, Inc.*, 640 F.2d 584, 586 n.2 (5th Cir. Mar. 1981) (en banc) ("[The party] has not renewed this argument in his briefs to the en banc court, and we therefore consider the argument to have been abandoned."); *see also Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union*, 468 U.S. 491, 500 n.9 (1984) (reasoning that, when a state party fails to "press [a] *Younger* abstention claim" on appeal and submits to the court's

---

[16] Because the majority opinion remands on *Younger* and subtracts a number of defendants, it does not reach the merits of the preliminary injunction. I will not, therefore, spend much time on the merits other than to say that I continue to conclude that *ODonnell I* was correctly decided and would affirm the district court's injunction for the reasons set forth in the district court's opinion.

jurisdiction, it effectively "agree[s] to . . . adjudication of the controversy" such that comity concerns "are not implicated"); *Tex. Ass'n of Bus. v. Earle*, 388 F.3d 515, 519 (5th Cir. 2004) (noting that *Younger* arguments can be waived even if the doctrine would otherwise apply). It should go without saying that resuscitating an abandoned argument, as the majority opinion does, is directly contrary to "our adversarial system of adjudication" and "the principle of party presentation."[17] *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *see also Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021) ("Courts should not selectively address forfeited arguments just because they have sympathy for a particular litigant."). That should end the matter.

The majority opinion nonetheless "sall[ies] forth" on its own initiative.[18] *Sineneng-Smith*, 140 S. Ct. at 1579 (quotation omitted). But even

---

[17] Of course, we are required to address subject matter jurisdiction because it cannot be waived. But our precedents firmly establish that *Younger* abstention is non-jurisdictional. *Weekly v. Morrow*, 204 F.3d 613, 615 (5th Cir. 2000). The majority opinion does not claim to be overruling our holdings on that score, so I am at a loss as to why we would raise this abstention issue sua sponte, even if it is theoretically in our power to do so. *Cf. Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976) (noting merely that *some* abstention doctrines "*may*" be raised sua sponte (emphasis added)). *But see* E. Martin Estrada, *Pushing Doctrinal Limits: The Trend Toward Applying* Younger *Abstention to Claims For Monetary Damages and Raising Younger Abstention Sua Sponte on Appeal*, 81 N.D. L. Rᴇᴠ. 475, 476 (2005) (describing "[s]ua sponte application of *Younger* abstention" as "suspect," noting that "the Supreme Court has not directly addressed the issue of whether *Younger* abstention can be raised sua sponte on appeal," and emphasizing that such a step "rests on shaky ground—obiter dictum in [*Bellotti*] that is not at all concerned with *Younger* abstention").

That's especially so because the principle the majority opinion surely attempts to vindicate—respect for the state courts—has been abandoned in this case by the very parties most acutely connected to that interest: state court judges. *See Brown*, 468 U.S. at 500 n.9. Since they no longer brief the claim that *Younger* is implicated here, why should we?

[18] The majority opinion proceeds on its own initiative, even though the offices of Defendants' counsel are "chock-full of excellent attorneys." *Lucio v. Lumpkin*, 987 F.3d 451, 506 (5th Cir. 2021) (en banc) (Haynes, J., dissenting), *cert. denied*, No. 21-5095, 2021

if we consider the merits of this argument, it fails.  Our—and more importantly, the Supreme Court's—precedents make it plain that *Younger* abstention is entirely inappropriate here.  Abstention is only appropriate if the case requires (1) interference with an "ongoing state judicial proceeding" (2) that "implicate[s] important state interests" and (3) that offers an "adequate opportunity" to "raise constitutional challenges."  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *see Younger*, 401 U.S. at 43–49.  Specifically, the first and third conditions for triggering *Younger* are plainly not met in this case.

As to the first, general-purpose procedural safeguards (like those ordered by the district court) do not directly interfere with any particular criminal proceeding.  *Pugh v. Rainwater*, 483 F.2d 778, 782 (5th Cir. 1973) (concluding that a challenge to "pre-trial procedural rights" did not interfere with "any state prosecution *as such*"), *rev'd on other grounds sub nom. Gerstein v. Pugh*, 420 U.S. 103, 108 n.9 (1975) (reversing on the merits but likewise concluding that abstention was not required because the requested injunction's procedural reforms requiring probable cause hearings were "not directed at the state prosecutions as such"); *see ODonnell I*, 892 F.3d at 156–57; *see also Tarter v. Hury*, 646 F.2d 1010, 1013–14 (5th Cir. Unit A June 1981) (concluding that "nondiscretionary procedural safeguard[s]" did not interfere with a criminal proceeding).

As to the third, the Supreme Court has told us that state criminal proceedings (like the ones Plaintiffs face) generally do not offer adequate opportunities to raise concerns about the constitutionality of pretrial detention processes.  As the Supreme Court explained in *Gerstein*, "the

WL 4822723 (U.S. Oct. 18, 2021) (mem.).  Although we liberally construe pro se briefs, we do not make arguments for those litigants, so we really do not need to make arguments here on behalf of well-represented parties.

No. 18-11368

legality of pretrial detention without a judicial hearing" almost universally cannot "be raised in defense of the criminal prosecution." 420 U.S. at 108 n.9. There can be no serious debate that the same point holds true here; plainly, unconstitutional pretrial detention is not a defense to, say, a theft charge. *See generally* Tex. Penal Code Ann. § 31.03. Under the Supreme Court's reasoning in *Gerstein*, then, Plaintiffs lack an adequate opportunity to raise their detention challenges in the proceedings they are facing. *See* 420 U.S. at 108 n.9.

These authorities—especially the Supreme Court's *Gerstein* opinion—put beyond doubt that *Younger* abstention is completely unwarranted. The cases relied upon in the majority opinion are not to the contrary because the Supreme Court's decision in *O'Shea* and our decision in *Tarter*, are both distinguishable.

*O'Shea v. Littleton*, 414 U.S. 488 (1974), involved more than just bail setting, it also involved issues at other stages of the proceedings, including allegedly discriminatory sentencing and jury fee practices (some by a county attorney's office), all of which the district court would have to review *on the merits*. *See id.* at 491–92; *Littleton v. Berbling*, 468 F.2d 389, 392–93 (7th Cir. 1972) (underlying case summarizing the challenged conduct). Moreover, *O'Shea* suggested that the plaintiffs in the case had an adequate opportunity to present their claims in the proceedings themselves through, for example, appealing any racially discriminatory sentences. 414 U.S. at 502. Certainly, *O'Shea* stands for the proposition that beginning-to-end federal supervision of the state courts is inappropriate. But it is clear that more limited procedural challenges to a pretrial detention regime (as in this case) can proceed in federal court; after all, *Gerstein*—decided the year after *O'Shea*—specifically held that requests for probable cause hearings *do not* require abstention. *Gerstein*, 420 U.S. at 108 n.9.

No. 18-11368

Indeed, our decision in *Tarter* elucidates that line.  To be sure, *Tarter* concluded that a federal district court should abstain from reviewing *the merits* of excessive bail claims while an arrestee is being detained (a holding the majority opinion emphasizes)—but *Tarter* also concluded that a federal court is well within its rights to consider requests for "nondiscretionary procedural safeguard[s]" (a holding the majority opinion ignores).  646 F.2d at 1013–14.  Nothing about the district court's injunction in this case requires the district court to review *the merits* of any bail determination—at most, it requires Defendants to take certain nondiscretionary procedural steps (providing affidavits for arrestees to fill out, giving them hearings, and considering their ability to pay) and then provide the district court with a list of arrestees who have not received those safeguards.  All of those requirements are consistent with *Tarter*.

The majority opinion's determination to ignore *Gerstein* and apply inapposite authority is, of course, problematic in its own right.  But the majority opinion's *Younger* holding *also* breaks with the First, Third, Ninth, Eleventh, and D.C. Circuits, all of which have correctly held that abstention is inappropriate in the pretrial detention context in light of *Gerstein*. *Fernandez v. Trias Monge*, 586 F.2d 848, 851–54 (1st Cir. 1978); *Stewart v. Abraham*, 275 F.3d 220, 225–26 (3d Cir. 2001); *Arevalo v. Hennessy*, 882 F.3d 763, 766 (9th Cir. 2018); *Walker v. City of Calhoun,* 901 F.3d 1245, 1254–55 (11th Cir. 2018); *Campbell v. McGruder*, 580 F.2d 521, 525–26 & n.6 (D.C. Cir. 1978).

In short, as many of our sister circuits have wisely recognized, *Younger* abstention is foreclosed by precedent here.[19]  In any event, it would be a

---

[19] Tellingly on this point, the highest judicial officers of our state courts, with *the Chief Justice of Texas* as their president, have filed an amicus brief in this case, asking *us* to resolve the merits of Plaintiffs' claims and decide what procedures the Constitution requires.  They

No. 18-11368

significant stretch to say that the procedures of Dallas County's pretrial detention scheme could be meaningfully challenged in Plaintiffs' state court prosecutions. In fact, the absence of meaningful review lies at the very core of Plaintiffs' claims. Per Plaintiffs, the pretrial bail system improperly continues to keep them detained without conducting adequate hearings to determine whether they can pay bail. Those allegations were born out by the district court's fact-finding in this case: Plaintiffs are detained for days, weeks, and sometimes months all on the basis of half-minute arraignment hearings that are about as nuanced as ordering from a drive-thru window at a burger joint. They have their name called, and they are told how much they have to pay. There is no opportunity to challenge the process, let alone to make constitutional arguments like those raised in this case. Abstention is plainly inappropriate, so remand is unnecessary.

### III.    Conclusion

The bail system at issue in this case blatantly violates arrestees' constitutional rights. Freedom should not depend entirely on the financial resources at one's disposal—and yet, in Dallas County, it does. That the majority opinion attempts to find a way to remove our obligation to address these critical issues is problematic. Because there are no jurisdictional issues and *Younger* is not before us, we should have reached the merits of the preliminary injunction and affirmed. Given the majority opinion's different pathway, I respectfully dissent.

---

tell us that our "intervention is necessary" and specifically "request[] that [we] comprehensively articulate and analyze the fundamental constitutional principles." In doing so, our state court compatriots apparently see what the majority opinion does not; that federal involvement in these matters does not threaten the health of the state courts, it fortifies it.